PLANNED PARENTHOOD OF MINNE-
SOTA, a Minnesota non-profit
corporation, Appellee,

v.

The STATE OF MINNESOTA, Rudy Per-
pich, Individually and as Governor of
the State of Minnesota, Warren R. Law-
son, M. D., Individually and as Commis-
sioner of Health of the Minnesota De-
partment of Health, Warren Spannaus,
Individually and as Attorney General of
the State of Minnesota, their agents,
representatives, successors, those acting
in concert with them, and all others sim-
ilarly situated, Appellants.

No. 79-1218.

United States Court of Appeals,
Eighth Circuit.

Submitted May 18, 1979.

Decided Jan. 2, 1980.

Kent G. Harbison, Sp. Asst. Atty. Gen.,
St. Paul, Minn., for appellants; Warren R.
Spannaus, Atty. Gen., Richard B. Allyn, Sol.
Gen., and Terrence P. O'Brien, Sp. Asst.
Atty. Gen., St. Paul, Minn., on brief.

Franz P. Jevne, III, Mackall, Crounse &
Moore, Minneapolis, Minn., for appellee.

Before LAY, BRIGHT and HENLEY,
Circuit Judges.

LAY, Circuit Judge.

Planned Parenthood of Minnesota, a nonprofit corporation, sought a declaratory judgment under 28 U.S.C. § 2201, challenging the constitutionality of section 1, subdivision 2 of the Minnesota Family Planning Grants Act, Minn.Stat.Ann. § 145.925(2) (1979 Supp.). Under the Act $1,300,000 is appropriated for disbursement by the Minnesota Commission of Health to cities, counties, or nonprofit corporations to provide pre-pregnancy family planning services. The challenged subdivision provides:

> The commissioner shall not make special grants pursuant to this section to any nonprofit corporation which performs abortions. No state funds shall be used under contract from a grantee to any nonprofit corporation which performs abortions. This provision shall not apply to hospitals licensed pursuant to sections 144.50 to 144.56, or health maintenance organizations certified pursuant to chapter 62D.

The district court, the Honorable Donald Alsop presiding, concluded that granting funds for pre-pregnancy family planning to hospitals and health maintenance organizations (HMOs) who perform abortions, while denying funds to other nonprofit organizations involved in pre-pregnancy family planning who similarly perform abortions, denied equal protection of the law guaranteed under the Fourteenth Amendment to the United States Constitution. We affirm the judgment of the district court.

 The district court rejected plaintiff's argument that the right of an individual to choose to have an abortion is at issue and that state legislation must be reviewed under the strict scrutiny test when such fundamental rights are involved. As long as a state has not denied individuals the right to choose abortion services or to seek abortion services, no fundamental right is involved; nor is a state required to provide financial assistance for the exercise of that right. *Maher v. Roe,* 432 U.S. 464, 97 S.Ct. 2376, 53 L.Ed.2d 484 (1977); *Poelker v. Doe,* 432 U.S. 519, 97 S.Ct. 2391, 53 L.Ed.2d 528 (1977). The State's failure to fund pre-pregnancy family planning services sponsored by Planned Parenthood does not impinge on the personal right to privacy. Thus, we agree that the strict scrutiny test relied upon by Planned Parenthood, as applied in *Roe v. Wade,* 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973), was properly rejected by the district court.

Nonetheless, the district court found the statute unconstitutional. The court concluded there was no rational basis for the classification distinguishing between nonprofit organizations which are hospitals or HMOs and those which are not. *United States Department of Agriculture v. Moreno,* 413 U.S. 528, 534, 93 S.Ct. 2821, 37 L.Ed.2d 782 (1973).

In *Moreno* the constitutionality of section 3(e) of the Food Stamp Act was considered. The purpose of the Act was to alleviate hunger and malnutrition among the more needy segments of our society. Section 3(e) and the regulations promulgated thereunder limited participation in the food stamp program to households whose members were all related to each other. The Court held that the classification was "clearly irrelevant to the stated purposes of the Act." *Id.* It stated that if the classification was to be sustained it "must rationally further some legitimate governmental interest other than those specifically stated in the congressional 'declaration of policy.'" *Id.* The legislative history of section 3(e) indicated that the amendment was intended to prevent so-called "hippies" and "hippie communes" from participating in the food stamp program. The Court concluded:

> The challenged classification clearly cannot be sustained by reference to this congressional purpose. For if the constitutional conception of "equal protection of the laws" means anything, it must at the very least mean that a bare congressional desire to harm a politically unpopular group cannot constitute a *legitimate* governmental interest. As a result, "[a] purpose to discriminate against hippies cannot, in and of itself and without reference to [some independent] considerations in the public interest, justify the 1971

amendment." *Moreno v. United States Department of Agriculture,* 345 F.Supp. [(D.C.) 310] at 314 n.11.

*Id.* at 534–35, 93 S.Ct. at 2826.

 The record demonstrates that Planned Parenthood of Minnesota in its abortion stance has made itself unpopular among some segments of the population. The legislative history of Minn.Stat.Ann. § 145.925(2) indicates that Planned Parenthood's unpopularity played a large role in its passage. Planned Parenthood's unpopularity in and of itself and without reference to some independent considerations in the public interest cannot justify subdivision 2.

The district court observed in its unpublished opinion:

There is a general agreement that *the purpose behind the Act itself is to expand the availability of pre-pregnancy family planning services in Minnesota.* . . .

The legislative purpose behind the challenged provision is not as clear. It appears from the testimony at trial and the legislative record that the purpose of the exclusion is either (1) to insure that no state monies are used directly or indirectly to fund abortion services, or (2) to insure that no state monies are used to fund some non-profit corporations which perform abortion services. The issue presented to the court is whether the classifications drawn in the statute are reasonable in light of these purposes. *McLaughlin v. Florida,* 379 U.S. 184 [, 85 S.Ct. 283, 13 L.Ed.2d 222] (1964).

. . . . .

There is no dispute that the funds appropriated under the Act must be distributed solely for pre-pregnancy family planning services; thus, there is no possibility that the funds could be utilized directly for abortion services.

Defendants argue that the disbursement of Act funds to an organization which performs abortions as well as pre-pregnancy family planning services would allow such an organization to "free-up" monies of its own which it then could apply to the abortion services. This legislative concern is also found in the history of the Act. It is further evidenced by a purposed amendment to the Act which would have required an eligible applicant to maintain the same level of expenditure of its own monies on pre-pregnancy family planning services in a grant year as in the preceding year.

Even if this were a legitimate legislative concern (and the court notes that the "freeing-up" argument has been rejected by the courts in the context of state funding of private education), there is no evidence that it supports the challenged exclusion. At trial, plaintiff introduced testimony that it routinely receives restricted funding which is carefully controlled and monitored. Plaintiff has received and utilized federal funds which are specifically prohibited from being used for abortions.

. . . . .

The evidence adduced at trial is persuasive that there is no rational distinction between plaintiff and any other non-profit corporation with respect to the providing of pre-pregnancy family planning services, nor is there a rational distinction between plaintiff and other non-profit corporations which perform abortions (such as hospitals and HMO's) with respect to the providing of pre-pregnancy family planning services. . . .

(emphasis added).

The district court further observed:

Defendants allege that plaintiff has institutionalized its abortion policy in such a manner as to create an internal conflict of interest with the delivery of pre-pregnancy family planning services. The evidence at trial was that plaintiff initiated the performance of abortions at one clinic in January, 1977 as a result of its study indicating a high rate of repeat abortions in Minnesota. The decision was primarily motivated by a belief that through providing pre-pregnancy family planning counseling and contraceptive devices to women seeking abortions, plaintiff could help to reduce the re-occurrence of abortions.

Plaintiff's mission is to provide counseling and information to its patients, to educate the public and other professionals, and to deliver medical care. (Pl. exh. 1) In its November 1973 General Procedural and Policy Statement on abortion (Pl. exh. 2), plaintiff states that it "does not consider abortion to be a primary means of birth planning." There is no evidence that the nature or quality of plaintiff's delivery of prepregnancy family planning services has been affected by its decision to perform abortions. With respect to eligibility for funds for prepregnancy family planning services, the fact that abortions are performed at one of plaintiff's clinics as a result of an institutional decision by its board of directors does not distinguish it from hospitals and HMO's which merely provide the facilities for private physicians to perform abortions.

Defendants urge that hospitals and HMO's are distinguishable from other non-profit corporations which perform abortions in that (1) they perform abortions as part of the delivery of "total health care" services; (2) they are subject to greater legislative control and public accountability; (3) they provide superior in-house medical care resulting in better total family planning care; (4) they operate under a more complex accounting system which provides less opportunity for the operation of the freeing-up theory; and (5) HMO's are specifically required to provide abortions in certain circumstances. *There is no evidence to support the theory that these distinctions are critical or relevant to the granting of funds for pre-pregnancy family planning services.* (emphasis added).

■ On appeal we are not persuaded that the reasoning of the district court, based on its detailed findings of fact, can be faulted. In this court, the State suggests three possible reasons to justify the classification. The first to encourage and expand family planning services, can be accomplished just as easily by Planned Parenthood—perhaps even more easily. Planned Parenthood is in the business of family planning; it has fa-

cilities or programs in nearly every county in Minnesota. Whereas much of the money going to HMOs and hospitals would be used for start-up costs, Planned Parenthood's programs are already in place and the additional money would go directly to the family planning services rather than staff, program outlines and facilities, and the extraneous costs of providing those services. The argument that the money given to Planned Parenthood by the state might free-up other money which would be used for abortions was rejected by the district court. We further agree that Planned Parenthood's accounting procedures are more than adequate to insure that state money is not used for abortions nor allowed to free-up other money for abortions.

The second justification, that hospitals and HMOs implement abortion decisions already made by others, is making a distinction without a difference. Planned Parenthood's General Procedural and Policy Statements on abortion state: "[T]he decision whether or not to have an abortion is one which rightly should be left to the individual woman and her physician." There is no difference between hospitals, HMOs and Planned Parenthood in regard to the role they play in the abortion decision. In every instance it is up to the woman and her doctor.

The third justification, that hospitals and HMOs provide total health care, is misleading and insignificant. Many HMOs, according to the record, must use the additional facilities that a hospital offers. But even if both organizations did offer complete health care, to distinguish them from Planned Parenthood on that basis is irrelevant to the purpose of the Act, which as the district court found, is to expand the availability of pre-pregnancy family planning services. Not only must " '[a] classification . . . "be reasonable, . . . [it] must rest upon some ground of difference having a fair and substantial relation to the object of the legislation, so that all persons similarly circumstanced shall be treated alike." *Royster Guano Co. v. Virginia*, 253 U.S. 412, 415, 40 S.Ct. 560, 64 L.Ed. 989

(1920).'" *Stanton v. Stanton*, 421 U.S. 7, 14, 95 S.Ct. 1373, 1377, 43 L.Ed.2d 688 (1975) (quoting *Reed v. Reed*, 404 U.S. 71, 76, 92 S.Ct. 251, 30 L.Ed.2d 225 (1971)). Providing complete health care has no fair and substantial relation to expanding pre-pregnancy family planning services. The argument, at least in part, implies that patient safety was a concern of the legislature. It was established, however, that the risks of pre-pregnancy family planning services are slight and when complications do occur, it is invariably long after the patient has left the site where the services were rendered. In any event, if patient safety was indeed a serious concern of the legislature, it seems peculiar that it did not exclude · all nonprofit corporations other than hospitals and HMOs from funding, rather than just those that performed abortions.[1]

The justifications offered by the State are not unlike the rationale offered by the Government in *Moreno*. There the Court stated:

> [T]he Government maintains that the challenged classification should nevertheless be upheld as rationally related to the clearly legitimate governmental interest in minimizing fraud in the administration of the food stamp program. In essence, the Government contends that, in adopting the 1971 amendment, Congress might rationally have thought (1) that households with one or more unrelated members are more likely than "fully related" households to contain individuals who abuse the program by fraudulently failing to report sources of income or by voluntarily remaining poor; and (2) that such households are "relatively unstable," thereby increasing the difficulty of detecting such abuses. But even if we were to accept as rational the Government's wholly unsubstantiated assumptions concerning the differences between "related" and "unrelated" households, we still could

not agree with the Government's conclusion that the denial of essential federal food assistance to *all* otherwise eligible households containing unrelated members constitutes a rational effort to deal with these concerns.

*Moreno*, 413 U.S. at 535–36, 93 S.Ct. at 2826 (footnote omitted).

Judgment affirmed.

---

1. While we conclude that the district court properly held that the exclusion of appellee from participation in the state funds was improper, we wish to make it clear that we do not now deal with the right of the State of Minnesota to regulate by statute or otherwise the surgical, medical, hygienic or other standards that must be followed in the actual performance of abortions.