718 F.2d 938
 PLANNED PARENTHOOD OF CENTRAL AND NORTHERN ARIZONA, an
Arizona non-profit corporation; Planned Parenthood of
Southern Arizona, an Arizona non-profit corporation; Jack
Bashaw, M.D., on behalf of himself, his patients, and all
others similarly situated, Plaintiffs-Appellees,
v.
The STATE OF ARIZONA; Bruce E. Babbitt, individually and as
Governor of the State of Arizona; William Jamieson,
individually and as Director of the Department of Economic
Security; Robert K. Corbin, individually and as Attorney
General of the State of Arizona, their employees, agents,
representatives, successors, and those acting in concert
with them and all others similarly situated, Defendants-Appellants.
 No. 82-5437.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted Feb. 18, 1983.
Decided Oct. 18, 1983.
 
 Lawrence J. Rosenfeld, Dushoff & Sacks, Phoenix, Ariz., for plaintiffs-appellees.
 Anthony B. Ching, Phoenix, Ariz., for defendants-appellants.
 Appeal from the United States District Court for the District of Arizona.
 Before CHOY and ALARCON, Circuit Judges, and D. WILLIAMS,* District Judge.
 CHOY, Circuit Judge:
 
 
 1
 Planned Parenthood instituted this suit to challenge the constitutionality of a footnote to an Arizona appropriation bill that forbade the expenditure of state social welfare funds to support nongovernmental organizations that perform abortions and engage in abortion-related activities. The district court, on a motion for summary judgment, declared the footnote unconstitutional and permanently enjoined its enforcement. Planned Parenthood of Central & Northern Arizona v. Arizona, 537 F.Supp. 90 (D.Ariz.1982). The State now appeals the summary judgment, the attorneys' fee awarded to Planned Parenthood, and a preliminary injunction issued during the course of the litigation.
 
 I. Background
 
 2
 Arizona is a participant in a Title XX federal grant-in-aid program that provides federal funds for family planning services offered as a part of a state's social welfare program. During the period relevant to this suit, the federal government reimbursed a state for 90% of expenditures made for qualified family planning services, whether the state provided those services itself or contracted with private organizations to provide them. 42 U.S.C. Sec. 1397a(a)(1) (Supp. III 1979), amended by 42 U.S.C. Sec. 1397a (Supp. V 1981); 45 C.F.R. Secs. 228.70 et seq. (1978) (recodified 1980; repealed 1981). The providing agency or organization had to secure a 10% matching fund from state or private sources in order to complete funding for the services and to remain eligible for the 90% federal assistance. 45 C.F.R. Secs. 228.53-.54 (1978) (recodified 1980, repealed 1981).
 
 
 3
 The State of Arizona had been providing the 10% matching funds to private organizations that provided family planning services under contract with the State. However, effective throughout the fiscal year from July 1, 1980, to June 30, 1981, the State of Arizona enacted a footnote to its General Appropriations Bill that forbade the Department of Economic Security from giving state money to any nongovernmental "agencies or entities which offer abortions, abortion procedures, counseling for abortion procedures or abortion referrals." 1980 Ariz.Sess.Laws 842, 860 n. *.[1]
 
 
 4
 Planned Parenthood of Central and Northern Arizona and Planned Parenthood of Southern Arizona (collectively referred to as Planned Parenthood) are private, non-profit, tax-exempt Arizona corporations that provide a full range of family planning services, including Title XX services provided under contract to the State of Arizona. Planned Parenthood of Central and Northern Arizona performs abortions and both organizations offer abortion referrals and abortion counseling. Thus, the Arizona Department of Economic Security, in order to comply with the statutory footnote, withheld state funding from Planned Parenthood.
 
 
 5
 Despite the loss of state funding, Planned Parenthood continued to operate as a provider of state family planning services and to receive federal Title XX funds. Under an arrangement with the State of Arizona, private funds contributed by Planned Parenthood, instead of state funds, were used to meet the 10% matching-fund requirement. The fiscal 1980-1981 contract between Arizona and Planned Parenthood called for $47,000 in family planning services. Planned Parenthood brought suit in the district court to enjoin enforcement of the footnote to the appropriations bill.
 
 
 6
 On October 7, 1980, the district court preliminarily enjoined the defendants from complying with the challenged footnote, thus forcing the State to provide 10% of the total contract amount (i.e., $4,700) in state funds to Planned Parenthood. The State of Arizona appealed the preliminary injunction, but the appeal was dismissed as moot after the district court declared the Arizona footnote unconstitutional and issued a permanent injunction on February 8, 1982. The district court's reasons for declaring the footnote unconstitutional were (1) that it infringed Planned Parenthood's freedom of speech and (2) that it was void for vagueness. On this appeal, the State of Arizona challenges the merits of the district court's decision declaring the footnote unconstitutional and enjoining its enforcement, the correctness of the issuance of the preliminary injunction, and the award of attorneys' fees.
 
 II. Free Speech Claim
 
 7
 In setting forth their positions, both Planned Parenthood and the State of Arizona invoke principles of law well established in Supreme Court doctrine. The thrust of Planned Parenthood's argument is that the effect of the Arizona footnote is to penalize Planned Parenthood for exercising its constitutional right to freedom of speech;[2] "abortion referral" and "counseling for abortion procedures" are constitutionally protected speech, and the State of Arizona cannot declare such activities to be illegal. See Bigelow v. Virginia, 421 U.S. 809, 95 S.Ct. 2222, 44 L.Ed.2d 600 (1975) (statute making it a misdemeanor to sell or circulate any publication encouraging or prompting the procuring of an abortion declared an infringement of freedom of speech).
 
 
 8
 Planned Parenthood argues, and the district court agreed, that the challenged Arizona statute is an unconstitutional attempt to do indirectly what the State could not do directly. In other words, Planned Parenthood maintains that instead of instituting a criminal penalty that restricts freedom of speech, the State is attempting to dissuade constitutionally protected speech activities by withdrawing a government benefit from those who engage in such activities.
 
 
 9
 The Supreme Court has clearly articulated that government may not restrict exercise of constitutionally protected rights, even when that restriction takes the form of withholding a benefit, rather than applying a penalty, for that exercise.
 
 
 10
 For at least a quarter-century, this Court has made clear that even though a person has no "right" to a valuable governmental benefit and even though the government may deny him the benefit for any number of reasons, there are some reasons upon which the government may not rely. It may not deny a benefit to a person on a basis that infringes his constitutionally protected interests--especially, his interest in freedom of speech. For if the government could deny a benefit to a person because of his constitutionally protected speech or associations, his exercise of those freedoms would in effect be penalized and inhibited. This would allow the government to "produce a result which [it] could not command directly." Speiser v. Randall, 357 U.S. 513, 526 [78 S.Ct. 1332, 1342, 2 L.Ed.2d 1460 (1958) ]. Such interference with constitutional rights is impermissible.
 
 
 11
 Perry v. Sindermann, 408 U.S. 593, 597, 92 S.Ct. 2694, 2697, 33 L.Ed.2d 570 (1972).
 
 
 12
 For example, in Sherbert v. Verner, 374 U.S. 398, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963), a Seventh Day Adventist challenged a South Carolina law denying unemployment benefits to persons who failed without good cause to accept employment. The State declined to recognize as good cause her refusal to work on Saturday for religious reasons. The Supreme Court emphasized that the law placed her in a position of having to choose between denying the precepts of her religion and forfeiting benefits. Therefore, the Court found that the operation of the statute imposed a burden on the plaintiff's free exercise of her religion:
 
 
 13
 In a sense the consequences of such a disqualification to religious principles and practices may be only an indirect result of welfare legislation within the State's general competence to enact; it is true that no criminal sanctions directly compel appellant to work a six-day week. But this is only the beginning, not the end, of our inquiry.... Here not only is it apparent that appellant's declared ineligibility for benefits derives solely from the practice of her religion, but the pressure upon her to forego that practice is unmistakable. The ruling forces her to choose between following the precepts of her religion and forfeiting benefits, on the one hand, and abandoning one of the precepts of her religion in order to accept work, on the other hand. Governmental imposition of such a choice puts the same kind of burden upon the free exercise of religion as would a fine imposed against appellant for her Saturday worship.
 
 
 14
 ... It is too late in the day to doubt that the liberties of religion and expression may be infringed by the denial of or placing of conditions upon a benefit or privilege.
 
 
 15
 Id. at 403-04, 83 S.Ct. at 1793-94 (footnotes omitted).
 
 
 16
 Similarly, the Supreme Court struck down a California statute that limited a tax exemption to those members of the exempted class who affirmed their loyalty to the state government. California was under no obligation to grant such an exemption; the benefit was gratuitous. Yet, the Court found that the imposition of such a condition upon even a gratuitous benefit inevitably deterred or discouraged the exercise of the first amendment right of expression. Speiser v. Randall, 357 U.S. 513, 78 S.Ct. 1332, 2 L.Ed.2d 1460 (1958). See also Thomas v. Review Board of the Indiana Employment Security Division, 450 U.S. 707, 101 S.Ct. 1425, 67 L.Ed.2d 624 (1981) (denial of unemployment benefits to Jehovah's Witness who left job for religious reasons declared unconstitutional); Elrod v. Burns, 427 U.S. 347, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976) (dismissal from nonpolicymaking position on basis of political affiliation declared unconstitutional); Shapiro v. Thompson, 394 U.S. 618, 89 S.Ct. 1322, 22 L.Ed.2d 600 (1969) (denial of welfare benefits to new residents unconstitutionally infringes right to travel).
 
 
 17
 We, of course, are bound by and endorse such precedent, but we do not agree that the principle articulated in Perry is dispositive of the present case. The Supreme Court has also unequivocally stated that a state has no constitutional obligation to fund or promote abortion and "is not required to show a compelling interest for its policy choice to favor normal childbirth." Maher v. Roe, 432 U.S. 464, 477, 97 S.Ct. 2376, 2384, 53 L.Ed.2d 484 (1977). As the Court acknowledged in Maher, "There is a basic difference between direct state interference with a protected activity and state encouragement of an alternative activity consonant with legislative policy." Id. at 475, 97 S.Ct. at 2383 (footnote omitted).
 
 
 18
 Planned Parenthood argues that the State has waived its option to refuse to fund abortion or abortion-related activities by affirmatively deciding to fund family planning programs. According to Planned Parenthood, once the State has made an affirmative decision to fund family planning programs, the State cannot withhold funds from otherwise eligible providers solely because they promote and engage in constitutionally protected family planning methods the State disfavors. However, the Supreme Court's opinion in Maher expressly rejected similar logic.
 
 
 19
 In Maher, the Court rejected the holding of the district court panel that "abortion and childbirth ... are simply two alternative medical methods of dealing with childbirth" and that if a state decides to fund one, it must also fund the other in order to avoid "weight[ing] the choice of the pregnant mother against choosing to exercise her constitutionally protected right" to have an abortion. Id. at 468, 97 S.Ct. at 2379. The Supreme Court held that a state could refuse to fund abortion while funding childbirth because its refusal "place[d] no obstacles ... in the pregnant woman's path to an abortion." Id. at 474, 97 S.Ct. at 2382. And, the Court said that the "State may have made childbirth a more attractive alternative, thereby influencing the woman's decision, but it has imposed no restriction on access to abortions that was not already there." Id. Similarly, Arizona's decision to refuse to fund abortion and abortion-related speech activities may make childbirth and advocation of childbirth more attractive alternatives, but it has imposed no restriction on access to abortions or on the free flow of information concerning abortion.
 
 
 20
 Supreme Court precedent in the area of private-school education is analogous. In Pierce v. Society of Sisters, 268 U.S. 510, 45 S.Ct. 571, 69 L.Ed. 1070 (1925), the Court invalidated an Oregon criminal law requiring the parent or guardian of a child to send him to public school, thus precluding the choice of a private school. The Court held that the law "unreasonably interfere[d] with the liberty of parents and guardians to direct the upbringing and education of children under their control." Id. at 534-35, 45 S.Ct. at 573-74. Later in Norwood v. Harrison, 413 U.S. 455, 93 S.Ct. 2804, 37 L.Ed.2d 723 (1973), the Court explicitly rejected the argument that Pierce established a "right of private or parochial schools to share with public schools in state largesse," for "[i]t is one thing to say that a State may not prohibit the maintenance of private schools and quite another to say that such schools must, as a matter of equal protection, receive state aid." Id. at 462, 93 S.Ct. at 2809.
 
 
 21
 We conclude that the State of Arizona may not unreasonably interfere with the right of Planned Parenthood to engage in abortion or abortion-related speech activities, but the State need not support, monetarily or otherwise, those activities.
 
 
 22
 A federal district court in Illinois, faced with a case similar to the present one, upheld as constitutional the portion of a state grant-in-aid program disqualifying applicants that provide abortion counseling and referral services. That court aptly described the situation:
 
 
 23
 Planned Parenthood's application for funds under the Act indicates that it would have used the funds for a program which includes abortion-related services. Therefore, it is Planned Parenthood which seeks to interfere with the right of [the State] to decline to encourage abortions, rather than the converse. Planned Parenthood seeks to compel [the State] to adopt a position of neutrality; subsidizing childbirth and abortion-related counseling and referral services on an equal basis. However, as [Harris v.] McRae [448 U.S. 297, 100 S.Ct. 2671, 65 L.Ed.2d 784 (1980) ] and Maher clearly indicate, there is no requirement that the state be neutral vis-a-vis abortion. It is free to express its preference for childbirth, by subsidizing it and not abortion.
 
 
 24
 Planned Parenthood Association--Chicago Area v. Kempiners, 531 F.Supp. 320, 325 (N.D.Ill.1981), vacated and remanded on other grounds, 700 F.2d 1115 (7th Cir.1983).
 
 
 25
 The question we must address in order to resolve this case is whether the Arizona statute embodies merely the State's refusal to fund activities it disfavors, or whether the State unduly interfered with Planned Parenthood's exercise of its right to perform abortion and abortion-related services. The State's constitutional purpose of promoting childbirth over abortion "may not be achieved by means which sweep unnecessarily broadly and thereby invade the area of protected freedoms." NAACP v. Alabama, 377 U.S. 288, 307, 84 S.Ct. 1302, 1314, 12 L.Ed.2d 325 (1964), quoted in Griswold v. Connecticut, 381 U.S. 479, 485, 85 S.Ct. 1678, 1682, 14 L.Ed.2d 510 (1965). We think it significant that the State allowed Planned Parenthood to continue as a Title XX provider of family planning services by contributing private funds in lieu of receiving state funds, thus making Planned Parenthood eligible for federal matching funds. The Arizona footnote withdrew only 10% of the governmental funding Planned Parenthood had been receiving for family planning services; the organization continued to receive the 90% of the funding that came from federal sources. Arizona could have placed a much more onerous burden on Planned Parenthood by refusing to operate as the channel through which the organization received federal Title XX funds. The fact that the statute withdrew only state, and not federal, funds from Planned Parenthood indicates that the Arizona legislature's main concern was to ensure that state funds not be used in a manner contrary to state social welfare policy and not, as Planned Parenthood argues, to deter the organization from engaging in constitutionally protected activities.
 
 
 26
 However, it is not clear that the statute was drawn as narrowly as possible to permit the State to control use of its funds while infringing minimally on exercise of constitutional rights. The statute withheld all state funds from nongovernmental entities offering "abortions, abortion procedures, counseling for abortion procedures or abortion referrals." A more narrowly drawn statute, which would accomplish the stated purpose of ensuring that state funds not be spent on activities the state legislature disfavors, would simply forbid entities receiving state funds from using those funds for abortions and the related activities listed above.
 
 
 27
 Arizona argues that such a narrowly drawn statute was infeasible for two reasons. The first is that the administrative difficulty of monitoring Planned Parenthood's use of the funds would make such monitoring impossible or highly impractical. The second reason is that even if the State could monitor Planned Parenthood's use of state funds in order to ensure that those funds did not support disfavored activities, state funding of any of Planned Parenthood's programs would "free up" funds to support abortion-related activities. We will deal with the second of these arguments first.
 
 
 28
 Other courts have looked upon the freeing-up theory with disfavor, see, e.g., Planned Parenthood of Minnesota v. Minnesota, 612 F.2d 359, 361 (8th Cir.), aff'd mem., 448 U.S. 901, 100 S.Ct. 3039, 65 L.Ed.2d 1131 (1980); Planned Parenthood Association--Chicago Area v. Kempiners, 568 F.Supp. 1490, 1495 (N.D.Ill.1983), and we hold that as a matter of law, the freeing-up theory cannot justify withdrawing all state funds from otherwise eligible entities merely because they engage in abortion-related activities disfavored by the state. Applying the logic of the freeing-up argument to another setting shows its hazards. It can be argued that by providing welfare benefits to a pregnant indigent woman, a state would be freeing up whatever other funds she may have at her disposal for use in paying for an abortion. Thus, the freeing-up argument, when coupled with the holding of Maher v. Roe, 432 U.S. 464, 97 S.Ct. 2376, 53 L.Ed.2d 484 (1977) (states are not constitutionally required to fund therapeutic abortions as part of their Medicaid programs), would lead to the conclusion that a state could refuse all Medicaid benefits to an otherwise eligible applicant because she had exercised her right to have an abortion. Although the Supreme Court has never addressed such a situation, the Court did mention in a footnote to Harris v. McRae that a statute withdrawing all Medicaid benefits from an eligible recipient who had an abortion would pose "[a] substantial constitutional question" and implied that such a statute would impose an unconstitutional penalty on the Medicaid recipient. 448 U.S. 297, 317 n. 19, 100 S.Ct. 2671, 2688 n. 19, 65 L.Ed.2d 784 (1980).[3]
 
 
 29
 The State's first argument against a more narrowly constructed statute--that monitoring Planned Parenthood's use of funds is administratively impossible--is a question of fact. Because the district court declared the statute at issue to be unconstitutional on a motion for summary judgment, the State has never had an opportunity to prove its contention. We, therefore, reverse the summary judgment and remand to give the State the opportunity to prove that withdrawing all state funds from Planned Parenthood was the only way to ensure that Planned Parenthood would not use state funds to support its abortion-related activities.
 
 III. Vagueness
 
 30
 The district court found the statute to be void because the term "counseling for abortion procedures" is vague. The State of Arizona questions both the standing of Planned Parenthood to challenge the statute on the vagueness ground and the district court's finding of vagueness. While we hold that Planned Parenthood did have standing to challenge the statute as unconstitutionally vague, we further hold that the term "counseling for abortion procedures" is not so vague as to render the statute void.
 
 
 31
 The general rule with respect to standing to challenge a law as unconstitutionally vague is that "[o]ne to whose conduct a statute clearly applies may not successfully challenge it for vagueness." Parker v. Levy, 417 U.S. 733, 756, 94 S.Ct. 2547, 2562, 41 L.Ed.2d 439 (1974); see Broadrick v. Oklahoma, 413 U.S. 601, 608, 93 S.Ct. 2908, 2913, 37 L.Ed.2d 830 (1973); Dombrowski v. Pfister, 380 U.S. 479, 491-92, 85 S.Ct. 1116, 1123-24, 14 L.Ed.2d 22 (1965). The State of Arizona argues that since the challenged statute withholds state funds from entities that perform abortions and since there is no contention that the terms "abortions" or "abortion procedures" are vague, Planned Parenthood has no standing to challenge the statute, for the statute clearly applies to Planned Parenthood's activities. The flaw in this argument is that only one branch of Planned Parenthood--Planned Parenthood of Central and Northern Arizona--performs abortions. Therefore, the State withheld funds from Planned Parenthood of Southern Arizona on the basis of its activities that were construed as "counseling for abortion procedures" or "abortion referral." Planned Parenthood challenged both of these terms as vague in the district court (although the court found only the former term to be vague). Therefore, Planned Parenthood had standing to challenge the statute on the ground that its terms are vague.
 
 
 32
 However, even if both Planned Parenthood entities performed abortions, we would have found standing to challenge the Arizona funding footnote. A different test of standing applies when the contention is that a statute places a prospective limitation on an individual's exercise of his first amendment expression right and the statute is so vague that a person of reasonable intelligence cannot determine what the boundaries of that limitation are. The Supreme Court noted this distinction in Madison Joint School District No. 8 v. Wisconsin Employment Relations Commission:
 
 
 33
 The Wisconsin court's reliance on Broadrick v. Oklahoma, 413 U.S. 601 [93 S.Ct. 2908, 37 L.Ed.2d 830] (1973), for the proposition that one whose conduct falls squarely within an otherwise valid proscription may not challenge that proscription on grounds of vagueness, is inapposite. The challenged portion of the order is designed to govern speech and conduct in the future, not to punish past conduct, and as such it is the essence of prior restraint.
 
 
 34
 429 U.S. 167, 177, 97 S.Ct. 421, 427, 50 L.Ed.2d 376 (1976).
 
 
 35
 Even in its Broadrick decision, the Supreme Court acknowledged that the special protection afforded to first amendment rights includes use of a more liberal test of standing in overbreadth cases:
 
 
 36
 It has long been recognized that the First Amendment needs breathing space and that statutes attempting to restrict or burden the exercise of First Amendment rights must be narrowly drawn and represent a considered legislative judgment that a particular mode of expression has to give way to other compelling needs of society. As a corollary, the Court has altered its traditional rules of standing to permit--in the First Amendment area--"attacks on overly broad statutes with no requirement that the person making the attack demonstrate that his own conduct could not be regulated by a statute drawn with the requisite narrow specificity." Litigants, therefore, are permitted to challenge a statute not because their own rights of free expression are violated, but because of a judicial prediction or assumption that the statute's very existence may cause others not before the court to refrain from constitutionally protected speech or expression.
 
 
 37
 413 U.S. at 611-12, 93 S.Ct. at 2915-16 (citations omitted). As an otherwise eligible recipient of state funds, Planned Parenthood has standing to contend that the statute did not give adequate notice of what sorts of statements its members and staff must refrain from making in order for Planned Parenthood to remain eligible to receive state family planning services funds. See, e.g., Hynes v. Mayor of Oradell, 425 U.S. 610, 96 S.Ct. 1755, 48 L.Ed.2d 243 (1976) (candidate for political office and campaign workers successfully challenged statute regulating campaign activities as not adequately specifying which campaign activities required advance notice to police department).
 
 
 38
 While we are satisfied that Planned Parenthood had standing to challenge the footnote on a vagueness claim, we find that the claim is without merit.
 
 
 39
 A statute is unconstitutionally vague if persons of "common intelligence must necessarily guess at its meaning and differ as to its application," Connally v. General Construction Co., 269 U.S. 385, 391, 46 S.Ct. 126, 127, 70 L.Ed. 322 (1926), for in that situation, the statute "fails to give a person of ordinary intelligence fair notice" of conduct proscribed or required by the statute, United States v. Harriss, 347 U.S. 612, 617, 74 S.Ct. 808, 812, 98 L.Ed. 989 (1954), and encourages arbitrary and erratic behavior on the part of those officials charged with enforcing the statute, see Papachristou v. City of Jacksonville, 405 U.S. 156, 162, 92 S.Ct. 839, 843, 31 L.Ed.2d 110 (1972); Thornhill v. Alabama, 310 U.S. 88, 60 S.Ct. 736, 84 L.Ed. 1093 (1940). The Supreme Court has set out the hazards of vague laws in even greater detail:
 
 
 40
 Vague laws offend several important values. First, because we assume that man is free to steer between lawful and unlawful conduct, we insist that laws give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly. Vague laws may trap the innocent by not providing fair warning. Second, if arbitrary and discriminatory enforcement is to be prevented, laws must provide explicit standards for those who apply them. A vague law impermissibly delegates basic policy matters to policemen, judges, and juries for resolution on an ad hoc and subjective basis, with the attendant dangers of arbitrary and discriminatory application.
 
 
 41
 Grayned v. City of Rockford, 408 U.S. 104, 108-09, 92 S.Ct. 2294, 2298-99, 33 L.Ed.2d 222 (1972) (footnotes omitted), quoted in Village of Hoffman Estates v. The Flipside, Hoffman Estates, Inc., 455 U.S. 489, 498, 102 S.Ct. 1186, 1193, 71 L.Ed.2d 362 (1982).
 
 
 42
 The level of scrutiny we must apply to a law challenged on the vagueness ground is not fixed. "The degree of vagueness that the Constitution tolerates--as well as the relative importance of fair notice and fair enforcement--depend in part on the nature of the enactment." Flipside, 455 U.S. at 498, 102 S.Ct. at 1193. A law that interferes with the right of free speech should receive relatively more stringent scrutiny. Id. at 499, 102 S.Ct. at 1194; see Grayned, 408 U.S. at 109, 92 S.Ct. at 2299. On the other hand, we are more tolerant of possible vagueness in laws that impose civil rather than criminal penalties "because the consequences of imprecision are qualitatively less severe." Flipside, 455 U.S. at 499, 102 S.Ct. at 1194; see Winters v. New York, 333 U.S. 507, 515, 68 S.Ct. 665, 670, 92 L.Ed. 840 (1948). Our tolerance should be even greater in a case, such as the one before us, where the consequence of noncompliance with the enactment is not a civil penalty, but merely reduction of a government subsidy.
 
 
 43
 In reviewing the challenged Arizona law, we are mindful that "due process does not demand unattainable feats of statutory clarity," United States v. Maude, 481 F.2d 1062, 1068 (D.C.Cir.1973), and that "absolute precision in drafting laws is not demanded," particularly where the law does not impose a criminal penalty. High Ol' Times, Inc. v. Busbee, 673 F.2d 1225, 1229 (11th Cir.1982). We note that in the present case Planned Parenthood represented to this court that it has kept separate accounts and ledgers for the abortion-related activities covered by the challenged footnote since the time that footnote went into effect. This demonstrates that Planned Parenthood was able to derive sufficient guidance from the statute to determine which activities were disfavored by the State of Arizona. Planned Parenthood argues that while it understands the statute's scope, it has been unable to receive an interpretation of the footnote from the Arizona officials administering the program, and so the organization fears that its interpretation will differ from that of the State. Substantial numbers of lawsuits arise out of disagreements over the precise meaning of a statute. The potential for such differences of opinion cannot be enough to render a statute void for vagueness.
 
 
 44
 Moreover, although the program administrators may have declined to give a legal opinion interpreting the challenged term, the state attorney general issued an opinion concerning a predecessor to the footnote actually enacted in which he expounded upon the limits of the phrase "counseling for abortion procedures." Cf. Smith v. Goguen, 415 U.S. 566, 580 n. 29 (majority opinion) & 597 (Rehnquist, J., dissenting) 94 S.Ct. 1242, 1251 n. 29 & 1259, 39 L.Ed.2d 605 (1974) (looking to opinions of state attorney general for guidance in determining vagueness of statute). According to the attorney general's opinion, the term "counseling for abortion procedures" applies to "counseling insofar as such counseling explains abortion procedures. That is not to say that a doctor ... may not use the word 'abortion' in his consultation with his patient. The footnote should not be construed to interfere with the doctor-patient privilege and the doctor's obligation to his patient." Ariz.Att'y Gen.Op. No. I79-252 at 3 n. 5 (Oct. 11, 1979). This definition serves to answer the rhetorical questions the district court put forth in explaining its rationale for declaring the law void for vagueness. 537 F.Supp. at 92.
 
 
 45
 Throughout its brief to this court, Planned Parenthood used the terms "counseling for abortion procedures" and "abortion counseling" interchangeably. Had the state legislature used the latter term, Planned Parenthood's vagueness claim would have been stronger. We find that "counseling for abortion procedures" is a more narrowly drawn term. The term "abortion procedure" is commonly used to refer to the actual operation performed by medical personnel in carrying out the abortion. See, e.g., Roe v. Arizona Board of Regents, 113 Ariz. 178, 180, 549 P.2d 150, 152 (1976). Thus, the reasonable person would understand the statute to refuse funding for counseling activities closely tied to the actual abortion operation, such as preparing a woman who has already decided to have an abortion for the medical treatment she is about to undergo.
 
 
 46
 We reverse the district court's finding that the term "counseling for abortion procedures" is impermissibly vague.
 
 IV. Preliminary Injunction
 
 47
 Although the district court, on February 8, 1982, decided this case on the merits and instituted a permanent injunction against enforcement of the Arizona statute, the State of Arizona seeks to appeal the preliminary injunction granted by the district court on October 6, 1980. The State invokes the eleventh amendment in arguing that the district court erroneously granted the preliminary injunction. We have twice declined to hear the appeal on the ground that imposition of the permanent injunction made the question moot.
 
 
 48
 On January 4, 1982, we dismissed the first appeal on the basis of Planned Parenthood's representation that a permanent injunction had been granted. In fact, the district court announced orally that it would issue a permanent injunction on April 6, 1981, but did not enter a written order until February 8, 1982. Arizona thus claims that it was deprived of its rightful appeal on January 4, 1982, because of Planned Parenthood's misrepresentation. On March 25, 1982, we rejected Arizona's second attempt to appeal the imposition of the preliminary injunction, determining that the question of whether or not there actually had been a permanent injunction in effect on January 4, 1982, was mooted by the uncontested fact that a permanent injunction was in effect as of February 8, 1982.
 
 
 49
 In asking for reconsideration of our March 25, 1982, ruling, Arizona is asking us to ignore the "law-of-the-case" doctrine, which states that the decision of a legal issue by an appellate court must be followed in all subsequent proceedings in the same case at either the trial or appellate level. Moore v. Jas. H. Matthews & Co., 682 F.2d 830, 833 (9th Cir.1982). The discretion of an appellate court to review its earlier decisions should be exercised sparingly in order to avoid undermining the policy of finality that underlies the rule. Id. at 834; see Lathan v. Brinegar, 506 F.2d 677, 691 (9th Cir.1974) (en banc). Thus, the law-of-the-case doctrine applies "unless the evidence on a subsequent trial was substantially different, controlling authority has since made a contrary decision of the law applicable to such issues, or the decision was clearly erroneous and would work a manifest injustice." White v. Murtha, 377 F.2d 428, 432 (5th Cir.1967), quoted in Moore, 682 F.2d at 834.
 
 
 50
 Arizona argues that we should hear its current appeal of the preliminary injunction notwithstanding the imposition of the permanent injunction and our previous decision that the appeal was moot, because the constitutional question raised is one that is "capable of repetition, yet evading review." Southern Pacific Terminal Co. v. ICC, 219 U.S. 498, 515, 31 S.Ct. 279, 283, 55 L.Ed. 310 (1911). In other words, Arizona argues that it and other states will in the future be subject to such questionable preliminary injunctions, but may never be able to receive a hearing from an appellate court because imposition of a permanent injunction will always moot the appeal.
 
 
 51
 In the absence of a class-action suit, the "capable of repetition, yet evading review" doctrine is limited to situations where two elements combine: (1) the challenged action was of limited duration, too short to be fully litigated prior to its cessation or expiration; and (2) there is a reasonable expectation that the same complaining party will be subjected to the same action again. Weinstein v. Bradford, 423 U.S. 147, 149, 96 S.Ct. 347, 349, 46 L.Ed.2d 350 (1975) (per curiam). The doctrine has been invoked in cases where a court order, by its own terms, expired in a few days or in cases where the question raised was mooted by the termination of a nonjudicial activity that is usually of short duration. See, e.g., Nebraska Press Assn. v. Stuart, 427 U.S. 539, 546-47, 96 S.Ct. 2791, 2796-97, 49 L.Ed.2d 683 (1976) (pre-trial publicity order expired once jury impaneled); Carroll v. President of Princess Anne, 393 U.S. 175, 178-79, 89 S.Ct. 347, 350-51, 21 L.Ed.2d 325 (1968) (10-day order); Roe v. Wade, 410 U.S. 113, 125, 93 S.Ct. 705, 712, 35 L.Ed.2d 147 (1973) (human gestation period too short to allow completion of appellate procedure); Trans International Airlines, Inc. v. International Brotherhood of Teamsters, 650 F.2d 949, 956 n. 5 (9th Cir.1980) (great majority of economic strikes do not last long enough for complete judicial review).
 
 
 52
 A preliminary injunction is not a court order that expires after the passage of a prescribed or fixed amount of time; it remains in effect until the district court can hold a full hearing on and decide the merits of the case. A preliminary injunction may well be in effect long enough to allow appellate review. Indeed, we hear many appeals of preliminary injunctions. See, e.g., Painting and Decorating Contractors Association v. Painters and Decorators Joint Committee, 707 F.2d 1067 (9th Cir.1983); Los Angeles Memorial Coliseum Commission v. National Football League, 634 F.2d 1197 (9th Cir.1980); Munoz v. County of Imperial, 604 F.2d 1174 (9th Cir.1979), vacated, 449 U.S. 54, 101 S.Ct. 289, 66 L.Ed.2d 258 (1980). It is true that Arizona or some other state may be subjected to a similar preliminary injunction in the future. However, it is quite possible that another preliminary injunction against a state may be in effect long enough to allow appellate review of the issues Arizona now seeks to raise. Therefore, this situation does not meet the criteria for invoking the "capable of repetition, yet evading review" exception to the doctrine of mootness. Moreover, because of the complexity and importance of the eleventh amendment question the State of Arizona seeks to bring before us, we believe it would be preferable to address such issues in a context that presents live, rather than hypothetical, issues.
 
 
 53
 None of the exceptions to the law-of-the-case doctrine apply in the present situation. We are bound by our ruling on March 25, 1982, that the questions raised by the imposition of a preliminary injunction against the State of Arizona were mooted by the imposition of the permanent injunction, and we dismiss Arizona's appeal of the preliminary injunction.
 
 V. Attorneys' Fees
 
 54
 Because we are remanding this case, we vacate the attorneys' fee award pending the outcome on reconsideration. However, we note that we find nothing improper in the manner in which the district court computed the attorneys' fee.
 
 
 55
 The district court computed the amount of the award by first determining the number of allowable hours Planned Parenthood's attorneys spent on the case and multiplying this number by their customary hourly rate. The resulting product, $36,278, was labeled the "lodestar" amount. The district court then considered the controversy surrounding the issues involved in the litigation, the importance of those issues, the contingent nature of the fee arrangement between the plaintiffs and their attorneys, the novelty and complexity of the issues involved, the time pressure placed on the plaintiffs' attorneys, and the reputation, experience, and ability of the plaintiffs' attorneys. On the basis of these factors, the district court decided to increase the lodestar amount by a multiplier of 10%.
 
 
 56
 Arizona argues that 42 U.S.C. Sec. 1988 provides for an award of "reasonable attorneys' fees," and that a reasonable attorneys' fee would be an amount equal to the number of attorney hours expended multiplied by the customary hourly rate charged by the attorneys (i.e., the district court's lodestar amount). According to Arizona, any sum awarded beyond the lodestar amount is more closely akin to punitive damages than to reasonable attorneys' fees. However, Arizona's definition of a reasonable attorneys' fee award contradicts clear precedent in this court. In Kerr v. Screen Extras Guild, Inc., 526 F.2d 67, 70 (9th Cir.1975), cert. denied, 425 U.S. 951, 96 S.Ct. 1726, 48 L.Ed.2d 195 (1976), we established 12 factors that a district court should consider in determining a reasonable attorneys' fee award. Among those considerations were (1) the time and labor required; and (2) the customary fee. If the State of Arizona were correct in its assertion, only these two factors would be relevant considerations. Yet Kerr set forth 10 additional factors. Id. The list of factors adopted in Kerr closely parallels the factors considered by the district court in the present case.
 
 
 57
 In addition to setting forth a list of factors, we explicitly stated in Kerr that failure to consider such factors when determining the amount of an attorneys' fee award is an abuse of discretion. Id. Thus, the district court's adjustment of the attorneys' fee award to reflect factors other than the number of hours of attorney time expended and the normal hourly rate was not only allowed, but required, by the Kerr decision. The district court considered the necessary factors and there is nothing to suggest that the court abused its discretion in any way in determining the appropriate "multiplier" or adjustment factor. Cf. Hensley v. Eckerhart, --- U.S. ----, 103 S.Ct. 1933, 1940, 76 L.Ed.2d 40 (1983) ("exceptional success" may justify enhanced attorneys' fee award).
 
 
 58
 REVERSED and REMANDED.
 
 
 
 *
 The Honorable David W. Williams, Senior United States District Judge for the Central District of California, sitting by designation
 
 
 [1]
 The footnote at issue read, in relevant part:
 No state money may be spent by the department of economic security by contract, grant or otherwise, on abortions, abortion procedures, counseling for abortion procedures or abortion referrals. These restrictions are not applicable when it is necessary to save the life of a pregnant woman.
 No state money, other than money for comprehensive medical and dental care and the developmentally disabled, may be given by the department of economic security by contract, grant or otherwise to agencies or entities which offer abortions, abortion procedures, counseling for abortion procedures or abortion referrals. Governmental agencies or entities are exempt from the restrictions in this paragraph.
 1980 Ariz.Sess.Laws 842, 860 n. *.
 
 
 [2]
 The first amendment prohibition against infringement of freedom of speech is applicable to the states through the fourteenth amendment. Bigelow v. Virginia, 421 U.S. 809, 811, 95 S.Ct. 2222, 2227, 44 L.Ed.2d 600 (1975); Schneider v. State, 308 U.S. 147, 160, 60 S.Ct. 146, 150, 84 L.Ed. 155 (1939)
 
 
 [3]
 Even before the Harris opinion, the Supreme Court had noted the distinction between refusing to fund abortion and withdrawing all welfare benefits from an indigent woman who had obtained an abortion:
 Appellees rely on Shapiro v. Thompson, 394 U.S. 618 [89 S.Ct. 1322, 22 L.Ed.2d 600] (1969), and Memorial Hospital v. Maricopa County, 415 U.S. 250 [94 S.Ct. 1076, 39 L.Ed.2d 306] (1974). In those cases durational residence requirements for the receipt of public benefits were found to be unconstitutional because they "penalized" the exercise of the constitutional right to travel interstate.
 ....
 If Connecticut denied general welfare benefits to all women who had obtained abortions and who were otherwise entitled to the benefits, we would have a close analogy to the facts in Shapiro, and strict scrutiny might be appropriate under either the penalty analysis or the analysis we have applied in our previous abortion decisions.
 Maher v. Roe, 432 U.S. 464, 474 n. 8, 97 S.Ct. 2376, 2383 n. 8, 53 L.Ed.2d 484 (1977).