**GAY MEN'S HEALTH CRISIS, Hetrick Martin Institute, Horizons Community Services, San Antonio Tavern Guild AIDS Foundation, the Fund for Human Dignity, and the State of New York and the New York State Department of Health, Plaintiffs,**

v.

**Dr. Louis SULLIVAN or his Successor, Secretary of Health and Human Services; and James O. Mason or his Successor, Director of the U.S. Centers for Disease Control, Defendants.**

**88 Civ. 7482 (SWK).**

United States District Court,
S.D. New York.

May 11, 1992.

Center for Constitutional Rights by David Cole, Robert Abrams, Atty. Gen. by Joel Graber, Asst. Atty. Gen., American Civil Liberties Union Foundation by Ruth E. Harlow, Nan D. Hunter, William B. Rubenstein, New York City, for plaintiffs.

Otto G. Obermaier, U.S. Atty. S.D.N.Y. by Steven C. Bennett, Asst. U.S. Atty., for defendants.

## MEMORANDUM OPINION AND ORDER

KRAM, District Judge.

This action challenges the constitutionality of certain guidelines applicable to Centers for Disease Control (the "CDC") grants for educational materials related to Acquired Immunodeficiency Syndrome ("AIDS"). Plaintiffs and defendants are presently before the Court for the second time on motions to dismiss and cross-motions for summary judgment, following defendants' revision of the original restric-

tions and the continuation of discovery. Specifically, defendants have moved, pursuant to Fed.R.Civ.P. 12(b)(6), for dismissal of plaintiffs' First Amended Complaint (dated February 10, 1989) as modified by plaintiffs' Supplemental Pleading (dated September 26, 1990), or in the alternative, for summary judgment pursuant to Fed.R.Civ.P. 56. Plaintiffs have cross-moved for partial summary judgment.

## BACKGROUND [1]

The factual background for this motion is set forth in the Court's December 14, 1989 opinion, *GMHC v. Sullivan*, 733 F.Supp. 619 (S.D.N.Y.1989) (*"GMHC I"*), familiarity with which is assumed. For purposes of the present motions, however, the most relevant considerations are the Court's decision of December 14, 1989 and subsequent developments.

### The December 14, 1989 Opinion

In *GMHC I*, the Court concluded that four issues remained in this action: (1) whether the CDC gave "detailed and reasoned" consideration to the development of the grant terms, *id.* at 634, (2) whether the grant terms were "rationally related" to their acknowledged purposes, *id.* at 637, (3) whether the grant terms have been applied in an arbitrary fashion, *id.*, and (4) whether the grant terms are "void for vagueness." *Id.* at 639. The Court also concluded that further discovery was required on each of the four issues.[2] It is these four issues that are to be resolved on these motions.

### Revision of the Grant Terms

Subsequent to *GMHC I*, the CDC published a notice of revised grant terms and requested public comment on the proposed changes. *See* 55 Fed.Reg. 10667 (March 22, 1990). Parts (a) and (b) of the proposed revised Basic Principles read as follows:

    a. Language used in written materials ..., audiovisual materials ..., and pictorials ... to describe dangerous be-

haviors and explain less risky practices concerning HIV transmission should use terms, descriptors, or displays necessary for the intended audience to understand the messages.

    b. Written materials, audiovisual materials, and pictorials should not include terms, descriptors, or displays which will be offensive to a majority of the intended audience or to a majority of persons outside the intended audience.

*Id.*

The CDC received 133 comments on the proposed revised grant terms. 55 Fed.Reg. 23414 (June 7, 1990). These responses came "from concerned citizens and organizations including health departments, State and local government agencies, national organizations, and many local organizations," *id.*, as well as plaintiffs in this action. As summarized by the CDC,

> There were no objections to the requirement that materials not be offensive to a majority of the intended audience. However, 91 respondents provided comments concerning the requirement that materials not be offensive 'to a majority of persons outside the intended audience.' Five of the 91 respondents concurred while 86 expressed concerns regarding the impact of using such a standard. In addition to the respondents who specifically commented, 33 others objected generally to limitations on the content of materials for use in HIV prevention efforts.

*Id.* According to the Federal Register, examples of relevant comments included:

    this standard is contradicted by the standard set out in section 1.a., that materials 'should use terms, descriptors, or displays necessary for the intended audience to understand the message.'

    restricting the effectiveness of public health messages and information, partic-

---

1. These facts are adopted in part from defendants' and plaintiffs' statements of facts provided pursuant to Local Rule 3(g).

2. The Court found that these issues could not be resolved until there was production of additional Program Review Panel ("PRP") reports con-

cerning the implementation of the grant terms, documents concerning plaintiffs' allegations of the "chilling effect" of the restrictions, and *in camera* review by the Magistrate Judge of agency documents previously withheld on grounds of deliberative process privilege. *Id.* at 637, 640.

ularly when those messages have been targeted to individuals who may unknowingly be risking exposure to the virus, borders on the unethical and unconscionable.

an 'offensiveness' standard is so vague that it provides little guidance to those designing educational materials. It may actually deter the development of materials.

Offensiveness, even if it were capable of definition or application as a standard, has absolutely no relationship to how effective particular materials are in reducing risk behaviors.

people outside the intended audience do not need to be concerned with this information. If it does not affect them, they can choose to ignore it.

reactions of persons who are not the intended audience should not be the standard for assessing the suitability of materials that are specifically designed to reduce the rate of transmission in a defined, targeted audience.

The most effective and popular educational materials often contain pictorials and verbal messages that the majority of persons outside the intended audience may find offensive.

strong objections to any efforts to censor or eliminate graphic language or visuals from AIDS education efforts.

*Id.*

After considering these comments, the CDC modified several of the proposed changes, and on June 7, 1990, issued final revisions of the grant terms (the "Revised Grant Terms") applicable to AIDS–related educational materials. *Id.* The Revised Grant Terms provide that:

a. Written materials ..., audiovisual materials ..., and pictorials ... should use terms, descriptors, or displays necessary for the intended audience to understand dangerous behaviors and explain less risky practices concerning HIV transmission.

b. Written materials, audiovisual materials, and pictorials should not include terms, descriptors, or displays which will be offensive to a majority of the intended audience or to a majority of adults outside the intended audience unless, in the judgment of the Program Review Panel, the potential offensiveness of such materials is outweighed by the potential effectiveness in communicating an important HIV prevention message.

55 Fed.Reg. 23414 (June 7, 1990).[3]

Plaintiffs' Supplemental Pleading

In order to conform the pleadings to reflect the adoption of the Revised Grant Terms, on September 26, 1990, plaintiffs moved to supplement the First Amended Complaint.[4] Defendants did not oppose the motion, and on October 15, 1990, the Court granted plaintiffs' motion for leave to file their supplemental pleading. *See* Supplemental Pleading, Attached as Exhibit "L" to Declaration of Steven C. Bennett, executed on January 31, 1991 ("Bennett Dec. I"). The Supplemental Pleading alleges that the Revised Grant Terms continue to require panel members to determine whether the content of funded materials are "offensive ... to a majority of adults outside the intended audience." Supplemental Pleading, at 1–2. It also alleges that the grant terms give no guidance as to how a Panel Member is to make such a determination. *Id.* at 2. Accordingly, plaintiffs request that the Court: (1) declare that the

3. By contrast, at the time of the first summary judgment motions, the CDC grant terms were as follows:

a. Language used in written materials ..., audiovisual materials ..., and pictorials ... to describe dangerous behaviors and explain less risky practices concerning AIDS should use terms or descriptors necessary for the target audience to understand the messages.

b. Such terms or descriptors used should be those which a reasonable person would conclude should be understood by a broad

cross-section of educated adults in society, or which when used to communicate with a specific group, such as homosexual men, about high risk sexual practices, would be judged by a reasonable person to be inoffensive to most educated adults beyond that group.

54 Fed.Reg. 10049 (March 9, 1989).

4. The allegations of the First Amended Complaint are discussed in detail in *GMHC I*, 733 F.Supp. at 626–27.

CDC Revised Grant Terms on their face violate the First and Fifth Amendments to the United States Constitution, (2) enjoin further application of the revised grant terms, (3) award plaintiffs reasonable attorneys' fees and costs, and (4) grant plaintiffs such other and further relief as the Court may deem proper. *Id.*

Subsequent Discovery Proceedings

In accordance with *GMHC I*, the parties have engaged in the discovery necessary to resolve at least three of the four remaining issues.[5]

Pursuant to *GMHC I*, on February 1, 1990, defendants provided the Magistrate Judge with copies of the 12 documents that had been withheld by the Government so he could determine whether any of the documents related to the remaining issues, and if so, whether the deliberative process privilege prevented their disclosure to the plaintiffs. Exhibit "A" to Bennett Dec. I. After an *in camera* review of the documents, the Magistrate Judge issued a ruling which directed that five of the 12 documents be produced to the plaintiffs. Exhibit "B" to Bennett Dec. I. The Magistrate Judge determined that the other documents were not relevant to the remaining issues in the action.[6] Accordingly, the Government has produced the five relevant documents to the plaintiffs.

Discovery of the State plaintiffs' records for evidence of the "chilling effect" of the funding restrictions has also gone forward as directed in *GMHC I. See GMHC I*, 733 F.Supp. at 637 n. 17.[7] On February 1, 1990, defendants sent a letter to the State plaintiffs calling for production of documents from their subgrantees relating to plaintiffs' claims that they have been deterred from producing certain AIDS educational materials and applying for federal funds for AIDS–related education. Exhibit "C" to Bennett Dec. I. On February 8, 1990, the State plaintiffs wrote a letter in response, which acknowledged that they had received no such documents. Exhibit "D" to Bennett Dec. I. According to the defendants, since February 8, 1990, the State plaintiffs have produced no documents in this category. *See* Bennett Dec. I, at ¶ 10.[8]

Discovery of PRP reports has also proceeded.[9] Defendants' most recent document productions took place in July 1990, February 1991, and on March 1, 1991. Declaration of Geoffrey E. Brown ("Brown

---

5. Plaintiffs contend that because the Revised Grant Terms have been in effect only since June 1990, and the Government has produced little documentation of how those terms are being applied, an exhaustive factual basis for plaintiffs' "as applied" claim cannot yet be put before the Court. Thus, according to plaintiffs, a summary determination of that claim would be inappropriate absent further discovery, and would of course be unnecessary if plaintiffs prevail on their facial claims. *See* Plaintiffs' Memorandum of Law In Support of Partial Summary Judgment and In Opposition to Defendants' Motion to Dismiss or for Summary Judgment ("Pl. Mem.") at 5 n. 1.

6. *See id.* at 27 (document would not "reflect on the two considerations [detailed and reasoned consideration, and rational relationship] that I am authorized to consider"); *id.* at 31–32 (document does not appear to have "anything about offensive or inoffensive"); *id.* at 35 (it does not appear that the purpose of the document is to "formulate regulations or at least the portions of the regulations that [plaintiffs'] are challenging); *id.* at 46 (document does not relate to "offensive or explicit materials" and is thus not "related to the issues ... "); *id.* at 53 (document does not

indicate "any matters related to the adoption or formulation of the grant terms"); *id.* at 54 (document "has nothing to do with the adoption of the [grant terms]").

7. In *GMHC I*, the Court directed that a sampling procedure should go forward, whereby the State plaintiffs would produce responses from approximately 50 of its subgrantees. *Id.* This discovery was aimed at plaintiffs' "as applied" claims. *Id.* at 637.

8. Plaintiffs claim, however, that such non-production is immaterial to this case as the State plaintiffs' sub-grantees would not be expected to keep documents reflecting the grant terms' chilling effect. According to the plaintiffs, "[c]ommon sense tells us that entities rarely keep records of actions that they never take, describing why those actions were not taken." Pl. Mem., at 16 n. 7.

9. In *GMHC I*, the Court directed that discovery of PRP reports should go forward "in order for the parties and the Court to gain a better sense of how the funding restrictions are applied, and consequently what effect this application has on the plaintiffs." *GMHC I*, 733 F.Supp. at 637.

Dec."), executed on March 15, 1991, at ¶¶ 6, 11, 18, 19.

The parties have also engaged in additional discovery. On October 4, 1990, defendants served their First Request for Admissions on plaintiffs, Exhibit "M" to Bennett Dec. I, in an effort to determine whether plaintiffs contended that any PRP had ever withheld approval for any AIDS–related educational materials based on the Revised Grant Terms. *Id.* at ¶ 1. If plaintiffs so contended, defendants requested that they produce all documents, and identify all potential witnesses, with respect to that contention. *See id.* at 4 (instruction number 4). Defendants also requested that plaintiffs produce all information in their possession concerning their allegations that some grant applicants have been "deterred" from applying for CDC funded grants for AIDS–related education. *See* Declaration of Steven Bennett, executed on May 31, 1991 ("Bennett Dec. II"), at ¶¶ 2–4 (detailing defendants' discovery requests). There has been substantial disagreement as to the production of such materials.

According to defendants, prior to this motion plaintiffs had identified only three examples (and produced only three documents) of what they contend are decisions by PRPs that denied federal funding for AIDS–related educational materials based on the Revised Grant Terms. *See* Bennett Dec. I, at ·21, 23, 25. Since the motion, however, plaintiffs have referred to a number of other PRP decisions, but have produced no supporting information. For example, plaintiffs claim that various PRPs have rejected materials, but have not produced copies of those materials, or any documentation concerning the PRP decisions. *See* Bennett Dec. II, at ¶¶ 8, 10, 11, 12, 14, 18, 19, 25, 26, 32, 33, 35, 38, 40. Further, although plaintiffs have claimed

that they and other AIDS education groups have been deterred from producing materials that might violate the revised grant terms, they have failed to produce copies of any such materials. *Id.* at ¶¶ 7, 13, 17, 20–22, 27, 28–29, 30, 37.[10] As a result, in July 1991 defendants served a second set of interrogatories and document requests upon plaintiffs. *See* Letter of Steven Bennett, dated July 2, 1991, at 2.

Plaintiffs claim, however, that they have produced such evidence. According to plaintiffs, the declarations submitted in connection with the present motion provide the details of each PRP decision to which they refer. Defendants have simply failed to appreciate the sufficiency of such declarations to adduce proof. Moreover, plaintiffs claim that they ·produced the GMHC safer-sex comics referred to in the Declaration of Amy DeGroff, *see* Exhibit "B" to Declaration of Dr. Gary R. Noble, executed on May 29, 1991 ("Noble Dec. IV"), an example of Hetrick Martin's AIDS education comics, Harlow Dec. II, at ¶ 4, and copies of educational materials referred to in the Declaration of David Prybylo. Exhibit "A" to Declaration of Ruth E. Harlow, executed on June 25, 1991 ("Harlow Dec. II"). Further, plaintiffs assert that they have produced numerous other relevant documents and have provided extensive interrogatory answers concerning the kinds of materials that are at issue here. *See* Plaintiffs' Reply Memorandum of Law In Support of Partial Summary Judgment and In Opposition to Defendants' Motion to Dismiss or for Summary Judgment ("Pl. Rep. Mem."), at 18, n. 12. Finally, plaintiffs assert that because AIDS education groups are deterred by the restrictions from producing certain educational materials, there are no documents to produce on this subject.[11]

---

**10.** As discussed above, the State plaintiffs have also produced no documents in support of their claim that they had been "chilled and deterred" from producing certain AIDS educational materials as a result of funding restrictions.

**11.** Despite that constraint, plaintiffs contend that they have provided specific examples of projects that have been abandoned or toned down because of anticipated problems with PRP

approval. *See* Declaration of Brad Trowbridge, executed on March 13, 1991 ("Trowbridge Dec."), at ¶¶ 8–10; Comment Letter from the American Red Cross to the CDC (included in Exhibit "B" to Harlow Dec. I); Felshman Dec., at ¶¶ 12–14; DeGroff Dec., at ¶ 9. They have also provided an example of a plaintiff that has not applied for CDC funding because of the deterrent effect. *See* Declaration of France Kunreuther, executed on March 15, 1991, at ¶ 3.

The Magistrate Judge attempted to resolve this discovery dispute as to the production of documents, and on October 1, 1991 directed that:

1. Counsel for the plaintiffs shall make inquiry of the declarants and shall, not later than October 25, 1991, produce to counsel for defendants copies of each and every document referred to by the declarants who submitted factual declarations in opposition to the defendants' motion to dismiss or for summary judgment and in support of plaintiffs' motion for summary judgment (i.e., Amy De-Groff, Ellie Emanuel, Jeff Felshman, Frances Kunreuther, David Prybylo, Michael Rampolla, Roger Rosenthal, Timothy Sweeney, Brad Trowbridge, Susanne Watson, and Reggie Williams) to the extent that those documents can be obtained from the declarants;

2. To the extent that the documents described in the preceding paragraph (1) do not exist, counsel for plaintiffs shall so state in writing;

3. Plaintiffs need not respond, except to the extent described in paragraphs 1 and 2, to Defendants' Second Set of Interrogatories and Request for Documents....

Pursuant to the above Order, on October 25, 1991, plaintiffs sent a letter to defendants, enclosing various documents mentioned in the factual declarations filed in conjunction with the pending summary judgment motions. *See* Exhibits "A" (letter) and "B" (documents) attached to Supplemental Declaration of Steven Bennett, executed on November 22, 1991. Accord-

ing to defendants, however, plaintiffs have still failed to produce documents in many categories. *See* Supplemental Declaration of Steven Bennett, at ¶¶ 7, 9–34, 36, 37, 39, 41. Plaintiffs rebut this allegation in a December 10, 1991 letter to the Court, and again state that it is unreasonable to expect plaintiffs to produce the very educational materials that have not been developed by AIDS educators because of the chilling effect of the grant terms. *Id.* at 2.

Recent Developments

• Further Revision of the Grant Terms

On December 13, 1991, the CDC published in the Federal Register a request for comments on its proposed Revision of Requirements for Content of HIV/AIDS–Related Written materials, Pictorials, Audiovisuals, Questionnaires, Survey Instruments, and Educational Sessions in Centers for Disease Control Assistance Programs. 56 Fed.Reg. 65169 (Dec. 13, 1991). The revised terms and conditions specified in the notice require "that if a nongovernmental organization receiving CDC funds chooses to establish its own Program Review Panel, it must include a health department representative in the composition of the panel." *Id.* at 65170. In addition, in recognition that the Fiscal Year 1992 Appropriations Act does not contain the language of the Kennedy–Cranston Amendment,[12] the Revision eliminates that requirement from the grant terms. *Id.* at 65170.[13]

The notice of proposed revisions called for comments no later than January 13, 1992, *id.* at 65169, and provided that the revisions would be applicable beginning in

---

12. The Kennedy/Cranston Amendment, first incorporated into the fiscal year 1989 appropriations act, P.L. 100–436 (1988), provided that AIDS education programs funded by CDC "shall not be designed to promote or encourage, directly, intravenous drug abuse or sexual activity, homosexual or heterosexual." This language was incorporated into funding statutes for fiscal years 1989–91.

13. Under Section 2641 of the Public Health Service Act, 42 U.S.C. § 300ff–41, the Secretary of Health and Human Services provides grants to states for HIV counseling and testing. Counseling programs carried out under that statute are subject to the requirement, similar to the re-

quirement in the Kennedy–Cranston Amendment, that such programs "shall not be designed to promote or encourage, directly, intravenous drug abuse or sexual activity, homosexual or heterosexual." Public Health Service Act, Section 2667, 42 U.S.C. § 300ff–67. As discussed, the fiscal year 1992 appropriations act does not provide any funds to CDC that are directly subject to this requirement. However, according to the defendants, through an inter-agency agreement with the Health Resources and Service Administration, CDC will receive $3 million in fiscal year 1992, and counseling programs produced with those funds will be subject to the terms of Section 2667.

February 1992 to AIDS–related activities and programs funded by CDC.

On March 30, 1992, after taking into account comments from 53 organizations and concerned citizens, CDC issued final revised terms and conditions. 57 Fed.Reg. 10794 (Mar. 30, 1992). These final revised terms are consistent with those that were proposed in the December 13, 1991 *Federal Register* Notice. *Id.* Specifically, the final revised terms contain two essential changes. First, the Kennedy–Cranston requirement was eliminated from the grant terms.[14] *Id.* The CDC contends, however, that its "administratively-imposed restrictions, currently in place in the CDC Guidelines, already cover the practical situations where the Kennedy–Cranston language would have applied." *Id.* According to CDC, although Congress has deleted the Kennedy–Cranston provision from CDC's 1992 appropriation act, it has not "disturbed the more stringent 'offensiveness' standard that CDC has developed administratively and which is retained unchanged in the Basic Principles in section 1 of these guidelines." *Id.* As such, it is CDC's view that "any material which would have failed to meet the Kennedy–Cranston standard ... would also fail to meet the 'offensiveness' standard that continues as part of the Basic Principles to be applied by Program Review Panels." *Id.*[15] The second change requires that if a nongovernmental organization chooses to establish its own PRP, it must include a state or local health department representative. *Id.* at 10796.

These revised grant terms are effective immediately, and apply to all materials being developed or distributed with CDC funds that have not yet been reviewed by a PRP. *Id.* at 10795.

• The Fiscal Year 1992 Appropriations Act

As stated above, the Fiscal Year 1992 Appropriations Act, P.L. 102–170, 105 Stat. 1107, 1115–16 (November 26, 1991), eliminated any reference to the Kennedy–Cran-

ston Amendment. Thus, the Appropriations Act itself contains no content restrictions on the fiscal year 1992 appropriations for funding of CDC AIDS–related educational programs.

The Pending Motions

Four issues remain in this matter: (1) whether the agency gave "detailed and reasoned" consideration to the development of the grant terms, *GMHC I,* 733 F.Supp. at 634, (2) whether the grant terms are "rationally related" to their acknowledged purposes, *id.* at 637, (3) whether the grant terms have been applied in an arbitrary fashion, *id.,* and (4) whether the grant terms are "void for vagueness." *Id.* at 639.

Presently, defendants move for a summary disposition on all four issues. Specifically, defendants move, pursuant to Fed. R.Civ.P. 12(b)(6), to dismiss the First Amended Complaint, as modified by Plaintiffs' Supplemental Pleading, or, in the alternative, for summary judgment pursuant to Fed.R.Civ.P. 56. Defendants contend that plaintiffs' pleadings are deficient as a matter of law because they have not cited a single instance of allegedly improper denial of funding based on the Revised Grant Terms, nor have they articulated any basis for their claims that the agency failed to give reasonable consideration to the development of the Revised Grant Terms. Defendants' Memorandum of Law In Support of Their Motion To Dismiss the Complaint, or in the Alternative, for Summary Judgment ("Def.Mem."), at 3–4. Alternatively, defendants seek summary judgment on the basis that plaintiffs are unable to come forward with specific facts showing that there is a genuine issue for trial. Fed. R.Civ.P. 56(e).

Plaintiffs oppose defendants' motions for dismissal and summary judgment, and cross-move for partial summary judgment upon the following claims: (1) that the CDC grant terms are unconstitutionally

---

**14.** The plaintiffs have never challenged the Kennedy–Cranston Amendment language, and therefore assert that the proposed revisions should have no impact on the pending motions.

*See* Plaintiff's Letter to the Court, dated January 2, 1992, at 2.

**15.** *See infra* n. 41.

vague, (2) that the content restrictions placed upon government-funded educational materials violate the First and Fifth Amendments because they are not rationally related to a legitimate Government interest, and (3) that the grant terms are beyond the CDC's statutory authority, and were adopted without detailed and reasoned decisionmaking. Pl. Mem., at 4–5.[16]

## DISCUSSION

### I. STANDARDS FOR SUMMARY JUDGMENT

■ Summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R.Civ.P. 56(c). In testing whether the movant has met this burden, the Court must resolve all ambiguities against the movant. *Lopez v. S.B. Thomas, Inc.,* 831 F.2d 1184, 1187 (2d Cir.1987) (citing *United States v. Diebold, Inc.,* 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962)).

■ The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. *Adickes v. S.H. Kress and Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970). The movant may discharge this burden by demonstrating to the Court that there is an absence of evidence to support the non-

moving party's case on which that party would have the burden of proof at trial. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986).[17] The non-moving party then has the burden of coming forward with "specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e). The non-movant must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Electric Industrial Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). Speculation, conclusory allegations and mere denials are not enough to raise genuine issues of fact. To avoid summary judgment, enough evidence must favor the non-moving party's case such that a jury could return a verdict in its favor. *See Anderson v. Liberty Lobby,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986) (interpreting the "genuineness" requirement).

### II. STATUTORY AUTHORITY

Plaintiffs argue that the Court need not reach their constitutional arguments because the CDC acted beyond its statutory authority in promulgating the Revised Grant Terms. According to plaintiffs, by adopting the "offensiveness" criterion, the CDC contravened its statutory authority, which bars funding only of "obscene," not "offensive," material. *See* 42 U.S.C. § 300ee.[18] Further, plaintiffs claim that

16. As discussed above, plaintiffs do not now move for summary judgment on their "as applied" claim. They, do, however, oppose defendants' motion for summary judgment on that claim.

17. The moving party may rely on the evidence in the record to point out the absence of genuine issues of material fact. *Celotex, supra,* 477 U.S. at 323, 106 S.Ct. at 2553. The moving party does not have the burden of providing evidence to negate the non-moving party's claims. *Id.* As the Supreme Court recently noted, "whether the moving party accompanies its summary judgment motion with affidavits, the motion may, and should, be granted so long as whatever is before the court demonstrates that the standard for the entry of summary judgment, as set forth in Rule 56(c), is satisfied." *Id.*

18. 42 U.S.C. § 300ee provides that:

(a) **In general.** The purpose of this title [42 USCS §§ 300ee et seq.] is to provide for the establishment of education and information programs to prevent and reduce exposure to, and the transmission of, the etiologic agent for acquired immune deficiency syndrome.
(b) **Contents of programs.** All programs of education and information receiving funds under this title [42 USCS §§ 300ee et seq.] shall include information about the harmful effects of promiscuous sexual activity and intravenous substance abuse, and the benefits of abstaining from such activities.
(c) **Limitation.** None of the funds appropriated to carry out this title [42 USCS § 300ee et seq.] may be used to provide education or information designed to promote or encourage, directly, homosexual or heterosexual activity or intravenous substance abuse.
(d) **Construction.** Subsection (c) may not be construed to restrict the ability of an edu-

the Revised Grant Terms must be invalidated because they were not the product of detailed and reasoned decisionmaking.

Defendants, however, contend that the provisions of 42 U.S.C. § 300ee are not inconsistent with CDC's Revised Grant Terms. In fact, they contend that 42 U.S.C. § 300ee does not govern current CDC grants. But, according to defendants, even if the terms of Section 300ee govern current CDC grants, that Section does not preclude the implementation of the Revised Grant Terms. Finally, defendants contend that the Revised Grant Terms must be upheld as the CDC considered their adoption in a detailed and reasoned fashion.

### A. GMHC I

In *GMHC I,* the Court concluded that the Secretary of Health and Human Services derived authority to make project grants for AIDS–related education from 42 U.S.C. § 247c, entitled "Sexually Transmitted Diseases and Acquired Immune Deficiency Syndrome." [19] *GMHC I,* 733 F.Supp. at 632. The Court also concluded that Section 247c provided "the Secretary of Health and Human Services (and his delegatee, the Director of the CDC) [with] broad discretionary power to choose appropriate recipients of federal AIDS educational funding under pertinent statutes." *Id.* at 634. Further, the Court determined that despite Congressional legislation in this area, "Congress did not specifically address itself to [the CDC grant term] restrictions," *id.,* and consequently never adopted or affirmed CDC's grant terms. Such failure to adopt or affirm, however, was insufficient to deny defendants' motion for summary judgment on this issue because "absent inconsistency with an Act of Congress,[20] this Court must defer to an agency's reasonable construction of its own enabling legislation and of the appropriations bills that fund it." *Id.* (citing *Planned Parenthood Fed. v. Agency for Int'l Development* ("AID"), 838 F.2d 649, 654 (2d Cir.1988) and *Chevron, USA v. Natural Resources Defense Council,* 467 U.S. 837, 844, 104 S.Ct. 2778, 2782–83, 81 L.Ed.2d 694 (1984)). In order to establish that an agency has made a reasonable construction, the Court must inquire whether "the agency considered the matter in a detailed and reasoned fashion." *GMHC I,* 733 F.Supp. at 634 (quoting *Chevron,* 467 U.S. at 865).

Having determined that there was no inconsistency with an Act of Congress, the Court, in *GMHC I,* moved to the issue of whether the CDC had considered the grant terms in a "detailed and reasoned" manner. Although the Court recognized that defendants' burden on that issue was "minimal," *see GMHC I,* 733 F.Supp. at 635, the Court found that there was insufficient evidence on the record to establish, as a matter of law, that the process of promulgating the CDC regulations rose to the level of "detailed and reasoned consideration." *Id.* According to the Court, none of the materials submitted by the parties indicated that there was a public notice of the proposed "offensiveness" restrictions followed by a comment period. *Id.* Thus, the Court concluded that it would refrain from judgment on the issue until it had further information before it.

Defendants presently contend that the Court now has the required information before it, and that such information establishes that defendants have met the "minimal burden" necessary for summary judg-

---

cation program that includes the information required in subsection (b) to provide accurate information about various means to reduce an individual's risk of exposure to, or the transmission of, the etiologic agent for acquired immune deficiency syndrome, provided that any informational materials used are not *obscene.* (emphasis added).

**19.** Section 247c in relevant part directs the Secretary to "make project grants to States and in consultation with the State health authority, to political subdivisions of the States...." 42

U.S.C. § 247c(c). It further instructs that "[g]rants made under [this subsection] shall be made on such terms and conditions as the Secretary finds necessary to carry out the purposes of such subsection...." 42 U.S.C. § 247c(d)(1).

**20.** Since Congress never addressed itself to CDC's restrictions, but rather applied some additional restrictions of its own, *GMHC I,* 733 F.Supp. at 634, there was no inconsistency between the grant terms and an Act of Congress. *Id.*

ment on this issue. First, the Revised Grant Terms were adopted after a notice and comment period whereby interested persons were given one month to comment. Second, the record indicates that the CDC specifically considered the 133 comments received, and modified several of the proposed changes in response to the comments. *See* Revised Grant Terms, 55 Fed. Reg. at 23414 ("CDC has modified several of the proposed changes"). Defendants may be correct that they have met the "minimal burden," but the Court finds that it is no longer appropriate to focus solely on whether the agency considered the matter in a "detailed and reasoned" fashion. Rather, in light of plaintiffs' argument that the Revised Grant Terms are inconsistent with an Act of Congress, namely, 42 U.S.C. § 300ee, see Pl. Mem., at 50–54, the Court must first revisit the issue of whether the CDC has exceeded its statutory authority.[21] For the following reasons, the Court finds that the Revised Grant Terms are inconsistent with 42 U.S.C. § 300ee, and thus beyond the CDC's statutory mandate.

### B. Relevant Statutory Authority

As *GMHC I* makes clear, there is no dispute that the Department of Health and Human Services ("HHS"), of which the CDC is a part, initially derived its authority to make AIDS prevention grants from 42 U.S.C. § 247c. Since 1984, that section, which applies to sexually transmitted diseases in general, has given HHS the authority to make grants for the purposes of:

(1) research into the prevention and control of sexually transmitted diseases;

(2) demonstration projects for the prevention and control of sexually transmitted diseases;

(3) public information and education programs for the prevention and control of such diseases, and

(4) education, training, and clinical skills improvement activities in the prevention

and control of such diseases for health professionals (including allied health personnel).

42 U.S.C. § 247c(b).

In 1988, however, Congress passed a separate law dealing with AIDS that gave HHS the authority to administer the AIDS education grant program. *See* 42 U.S.C. § 300ee *et seq.* Both the language and legislative history of this enactment indicate that Congress intended the statute, which adopts an "obscenity" standard, to delineate the federal government's approach to AIDS prevention and replace 42 U.S.C. § 247c as the statutory authority for AIDS prevention grants. As set forth in the statute, the purpose of the law "is to provide for the establishment of education and information programs to prevent and reduce exposure to, and the transmission of, the etiologic agent for acquired immune deficiency syndrome." 42 U.S.C. § 300ee(a). Further, subsection 300ee(d) of the statute declares that the Kennedy–Cranston Amendment language,[22] which was essentially adopted as subsection (b) of 42 U.S.C. § 300ee, must "not be construed to restrict the ability of an education program ... to provide accurate information about various means to reduce an individual's risk of exposure to or the transmission of, the etiologic agent for acquired immune deficiency syndrome, provided that any informational materials used are not *obscene.*" 42 U.S.C. § 300ee(d) (emphasis added).

Moreover, the legislative history indicates that Congress adopted the statute to set the nation's policy on the permissible limits of AIDS education. Specifically, the relevant Senate Report states that:

Congress first appropriated money specifically for AIDS in FY83, and the Administration first included AIDS funding in its budget request in FY84. *In all this time, there has been no specific*

---

**21.** At the time of *GMHC I,* the parties did not address the issue of whether the grant terms were inconsistent with 42 U.S.C. § 300ee, and subsequently, the Court did not address that issue.

**22.** The Kennedy–Cranston Amendment provided, inter alia, that AIDS education programs funded by the CDC "shall not be designed to promote or encourage, directly, intravenous drug abuse or sexual activity, homosexual or heterosexual."

*legislative authority for most of the PHS efforts on AIDS. All congressional direction for the level of research effort and the focus of agency priorities has been set through the appropriations process only.*

\* \* \* \* \* \*

*We have reached a point now where a comprehensive plan for action is needed.* During Senate floor debate over the recent supplemental appropriations bill, it was pointed out that appropriations bills should not be the vehicle for making national policy with respect to AIDS. Members agreed that it was time for the authorizing committees to play their proper role.

S.Rep. No. 100–133 at 5 (1987), *reprinted in* 1988 U.S.Code Cong. & Admin.News 4176, 4180.

The Senate Report goes on to emphasize that:

In the absence of drugs or vaccines against AIDS, the most effective tool we have to limit the spread of the virus is education of everyone at risk. Despite increased spending in the area of AIDS prevention and education for risk reduction, the existing activities have been seen as woefully inadequate by many.... There has been specific concern about the lack of targeted effort at some of the communities most at risk for transmission of the AIDS virus, especially the young minority and IV drug using population. In testimony before the Labor and Human Resources Committee in its AIDS hearings last year and this year, both Harvey Fineberg, Dean of the Harvard School of Public Health, and Sheldon Wolff, cochair of the AIDS Panel of the National Academy of Sciences, made clear the *necessity of reaching the highest risk groups by whatever means will catch their attention.... There have also been criticisms of the Centers for Disease Control because of an inability to pursue this agenda aggressively.*

S.Rep. No. 100–133 at 6–7, 1988 U.S.Code Cong. & Admin.News at 4181.[23]

Further, Senator Cranston explained during passage of the Act that the language that became 42 U.S.C. § 300ee was added to the legislation to allow "an aggressive education and prevention campaign." Senator Cranston also incorporated into his remarks an earlier letter in which he had noted that, through repeated votes, the Congress "has made clear its intent: The federal government must not interfere with or hamstring public health efforts to educate all Americans, including gay and bisexual men, about AIDS...." 134 Cong Rec. S15693 (Oct. 13, 1988).

Despite the language of the statute and its legislative history, defendants maintain that 42 U.S.C. § 300ee is not the statutory authority for the CDC's AIDS-related educational grant funding, and that 42 U.S.C. § 247c still applies. Defendants also maintain that the provisions of 42 U.S.C. § 300ee(d) do not set forth a congressional

---

**23.** Defendants contend, however, that the legislative history makes clear that the focus of Congressional concern was not the CDC's limitation on production of "offensive" educational materials, but on the lack of a widespread media blitz against AIDS. *See* Defendants letter to the Court, dated July 2, 1991, at 2–3. Defendants rely on a portion of the Senate Report which states:

The Committee believes that an intensive national awareness campaign should be developed and rapidly implemented to inform all Americans concerning the risks presented by the AIDS epidemic. It is the intention of the Committee that the Centers for Disease Control develop and disseminate an awareness campaign that will be carried by both print and broadcast communications media.

S.Rep. No. 100–133 at 55, 1988 U.S.Code Cong. & Admin.News at 4189. The Court disagrees with defendants interpretation of the legislative history. The Senate Report makes clear that the lack of a "media blitz against AIDS" was simply one problem among many that caused Congress to view AIDS as a public health emergency requiring comprehensive and aggressive action. Congress also expressed "specific concern about the lack of targeted effort at some of the communities most at risk for transmission of the AIDS virus" and stressed the "necessity of reaching the highest risk groups by whatever means will catch their attention." S.Rep. No. 100–133 at 6, 1988 U.S.Code Cong. & Admin.News at 4181.

standard regarding the content of AIDS-related educational materials.

In support of their position, defendants rely upon the following factors. First, when Congress adopted 42 U.S.C. § 247c, it specifically contemplated that funding under Section 247c would extend into fiscal year 1991. *See* 42 U.S.C. § 247c(d)(1) ("For the purposes of making grants under subsections (b) and (c) of this section there are authorized to be appropriated ... such sums as may be necessary for each of the fiscal years 1990 and 1991"). Second, 42 U.S.C. § 300ee, which was adopted as an amendment to Title XXV of the Public Health Service Act, has never been implemented. Indeed, in deliberations on appropriations for fiscal year 1991, congressional conferees expressly deleted funding for AIDS prevention formula grants under Title XXV. *See* H.R.Rep. No. 101–908 at 17 (Oct. 20, 1990). As agreed, "[t]he conferees ... decided not to fund this formula grant program and direct[ed] CDC to distribute these funds as it has in the past." *Id.; see* 136 Cong.Rec. H10795 (Oct. 20, 1990) (reporting conference decision). Further, the Fiscal Year 1992 Appropriations Act, which eliminated the Kennedy–Cranston Amendment, contains no authorization for funding of the CDC AIDS-related educational programs that is subject to the terms of 42 U.S.C. § 300ee. Thus, according to defendants, far from setting a congressional standard regarding the content of AIDS-related educational materials, Section 300ee is wholly irrelevant. *See* Defendant's letter to the Court, dated April 27, 1992, at 1.

■ The Court finds defendants' arguments unpersuasive. Although it is true that Congress contemplated that funding under section 247c would extend into fiscal year 1991, it would be contrary to common sense for the Court to rely on that section as the relevant statutory authority. Whereas 42 U.S.C. 300ee was adopted by Congress to deal exclusively with AIDS, the 1988 Health Omnibus Programs Extension Act removed any mention of AIDS

from 42 U.S.C. § 247c, a provision that had previously explicitly mentioned that disease.

In addition, the legislative history indicates that administrative convenience is the only reason why appropriations have not been funnelled through the grant programs detailed in 42 U.S.C. § 300ee–11 *et seq. See* 136 Cong.Rec. H10795 (Oct. 20, 1990) ("the conferees are concerned that implementation of the formula grant could result in the disruption of services and program in a number of states"). As such, there is no reason to question Congress' express statement of intent regarding the content of HIV prevention materials that is contained in section 300ee(d) and the legislative history. Nor is there reason for the Court to disregard the fact that Congress had specifically authorized funding for the formula grant programs set forth in 42 U.S.C. § 300ee–11 *et seq.* when it enacted those provisions. *See* 42 U.S.C. § 300ee–24; 42 U.S.C. § 300ee–34.

Thus, it is clear that the terms of 42 U.S.C. § 300ee apply to current CDC grants. The Court therefore turns to the issue of whether the CDC's Revised Grant Terms are inconsistent with the provisions of 42 U.S.C. 300ee.

C. Inconsistency with an Act of Congress

Defendants argue that even assuming that the terms of 42 U.S.C. § 300ee govern current CDC grants, the statute does not preclude the implementation of the CDC grant terms. As support for this position, defendants point to the fact that section 300ee is virtually identical to the Kennedy–Cranston Amendment, which the Court has already determined is not inconsistent with the CDC's grant terms. *See GMHC I,* 733 F.Supp. at 634 ("here Congress has remained silent about the CDC-imposed grant terms"). Both statutes call for educational programs to provide information about the harmful effects of promiscuous sexual activity and IV drug use.[24] Both statutes

**24.** The Kennedy–Cranston Amendment provides:

[AIDS education programs] shall provide information on the health risks of promiscuous

preclude the use of federal funds to promote or encourage, directly, homosexual or heterosexual sexual activity or intravenous substance abuse.[25] And both statutes require that AIDS education programs provide accurate information.[26] The sole significant addition in section 300ee is the requirement that AIDS educational materials not be obscene. *See* 42 U.S.C. § 300ee(d). According to defendants, however, the addition of the term "obscene" does not warrant a finding of inconsistency between the grant terms and section 300ee, because subsection (d) of the statute does not purport to guarantee funding for all educational materials, so long as they are not obscene; rather, the subsection sets a floor, not a ceiling for restrictions on the uses of federal funds. *See* Defendants' Reply Memorandum of Law In Further Support of Their Motion to Dismiss the Complaint, or, in the Alternative, for Summary Judgment, and In Opposition to Plaintiffs' Motion for Partial Summary Judgment ("Def. Rep. Mem."), at 20–21.

Defendants also point out that Congress has not expressly disturbed the "offensiveness" standard that the CDC has developed administratively. *See* 57 Fed.Reg. at 10794. There is nothing in 42 U.S.C. § 300ee or its legislative history that suggests that Congress intended, in adopting section 300ee, to repeal the Revised Grant Terms. If Congress intended to supplant the CDC's administrative guidelines with a single statutory standard, the legislative history would contain a plain statement to that effect. Thus, defendants contend

that, as with the Kennedy–Cranston Amendment, in enacting section 300ee, "Congress did not specifically address itself to [the CDC grant term] restrictions, but applied some of its own." *GMHC I,* 733 F.Supp. at 634. Accordingly, there can be no inconsistency between the statute and the grant terms, and the "Court must defer to [the] agency's reasonable construction of its own enabling legislation...." *Id.; see Rust v. Sullivan,* — U.S. —, 111 S.Ct. 1759, 1770, 114 L.Ed.2d 233 (1991) ("It is well established that legislative history which does not demonstrate a clear and certain congressional intent cannot form the basis for enjoining ... regulations").

■ The Court disagrees and finds that in using the "offensiveness" criterion, the CDC has contravened its statutory authority which bars funding only of obscene, not offensive material. 42 U.S.C. § 300ee(d). Defendants' argument that Congress intended only to set a floor in enacting subsection (d) is untenable in light of the legislative history of the statute. In fact, the legislative history makes clear that Congress intended the language of 42 U.S.C. § 300ee(d) to be a ceiling on the conditions that can be placed on AIDS education materials. The legislative history makes reference to the "necessity of reaching the highest risk groups *by whatever means will catch their attention.*" S.Rep. No. 100–133 at 6–7, 1988 U.S.Code Cong. & Admin.News at 4181 (emphasis added). Moreover, Senator Cranston explained that the language that became 42 U.S.C.

---

sexual activity and intravenous drug abuse. Section 300ee(b) of Title 42 provides:
All programs of education and information receiving funds under this subchapter shall include information about the harmful effects of promiscuous sexual activity and intravenous substance abuse, and the benefits of abstaining from such activities.

**25.** *Compare* Kennedy–Cranston Amendment, P.L. No. 100–436, Section 1 *with* 42 U.S.C. § 300ee(c).

**26.** The Kennedy–Cranston Amendment provides:
[AIDS education programs] shall be designed to reduce exposure to and transmission of the

etiologic agent for acquired immune deficiency syndrome by *providing accurate information ....*
Section 300ee(d) of Title 42 provides:
Subsection (c) of this section [restriction on promoting or encouraging certain activities] may not be construed to restrict the ability of an education program that includes the information required in subsection (b) of this section [requirement to provide information on harmful effects of promiscuous sexual activity and IV drug abuse] *to provide accurate information* about various means to reduce an individual's risk of exposure to, or the transmission of, the etiologic agent for the acquired immune deficiency syndrome, provided that any informational materials are not obscene.

§ 300ee was added to the legislation to allow "an aggressive education and prevention campaign." Further, a letter by Senator Cranston, which was incorporated into his remarks, noted that through repeated votes, Congress "has made clear its intent: The federal government *must not interfere with or hamstring public health efforts to educate* all Americans, including gay and bisexual men, about AIDS...." 134 Cong.Rec. S15693 (Oct. 13, 1988) (emphasis added).

Additionally, the fact that 42 U.S.C. § 300ee does not expressly mention the CDC's Revised Grant Terms or their repeal, does not preclude a finding that the grant terms are inconsistent with the provisions of section 300ee. Although Congress did not specifically mention the repeal of the CDC's grant terms, it addressed the precise issue addressed by the CDC grant terms, i.e., the funding of potentially "offensive" materials, and expressly limited the funding restriction to "obscene" materials. Thus, in enacting section 300ee, Congress did not merely apply additional restrictions to supplement those promulgated by the CDC, but rather clearly articulated its own standard for limitations on the content of HIV prevention materials, which can only be plausibly construed as inconsistent with the Revised Grant Term's "offensiveness" standard.

Because Congress has directly spoken to the precise issue in question by enacting an "obscenity" standard, and has made its intent clear both in the language of the statute and in its legislative history, "that is the end of the matter." *GMHC I*, 733 F.Supp. at 633 (quoting *Planned Parenthood Fed. v. AID*, 838 F.2d at 654).[27] Accordingly, the Court finds that the CDC has exceeded it statutory authority, and the Revised Grant Terms are without effect. Plaintiffs' motion for summary judgment on this issue is therefore granted, and de-

fendants' motion to dismiss the complaint or alternatively for summary judgment is denied.[28]

## III. VAGUENESS

The Court holds alternatively that even if the Revised Grant Terms are not inconsistent with the provisions of 42 U.S.C. § 300ee, they must be struck down as unconstitutionally vague.

Plaintiffs assert that the Revised Grant Terms are unconstitutionally vague, and thus violate the First and Fifth Amendments. According to plaintiffs, the CDC has not defined or clarified either the "offensiveness" or "effectiveness" standard set forth in the Revised Grant Terms. Moreover, there has been no guidance as to how to weigh such incomparable elements against each other. Further, that the PRPs must consider whether terms, descriptors, or displays "will be offensive to a majority of the intended audience or to a majority of adults outside the intended audience" multiplies the terms' vagueness.

By contrast, defendants contend that they are entitled to judgment on the issue of whether the Revised Grant Terms are void for vagueness. Defendants claim that the terms in the Original Grant Terms which were potentially void for vagueness, namely "educated adult" and "reasonable person," have been eliminated from the Revised Grant terms. Moreover, the CDC has clarified any disputed terms as well as specifically indicated, by example, certain educational materials that satisfy the standards set forth in the Revised Grant Terms. Further, according to defendants, the term "offensive" has never been held *per se* unconstitutionally vague. Finally, defendants contend that plaintiffs cannot point to a single example of an improper application of the Revised Grant Terms to

---

**27.** This case is distinguishable from *Rust v. Sullivan,* where the Supreme Court held that agency regulations were a permissible construction of Title X of the Public Health Service Act, because in that case the Court found that the "plain language of the statute" and the legislative history were "ambiguous." *Id.* at 1767, 1768.

**28.** Because the Court has determined that the Revised Grant Terms are inconsistent with 42 U.S.C. § 300ee(d), the Court need not address the issue of whether the CDC considered the grant terms in a "detailed and reasoned" fashion.

bolster their claim of vagueness. In fact, the evidence establishes that the CDC grant terms are capable of valid application.

██ In *GMHC I*, the Court set forth the standard to be applied to plaintiffs' vagueness claim. According to that opinion, in cases concerning subsidized speech, like the present one, the Court is to apply a "mixed level" of scrutiny. *GMHC I*, 733 F.Supp. at 638 (citing *Planned Parenthood of Central and Northern Arizona v. Arizona*, 718 F.2d 938, 948 (9th Cir.1983)). Such a "mixed level" of scrutiny is appropriate as it takes into account that "relatively more stringent scrutiny" is required because of the free speech dimension, *id.*, while recognizing that courts should be "more tolerant of possible vagueness in laws that impose civil rather than criminal penalties because the consequences of imprecision are qualitatively less severe." *Id.* In setting forth this standard of review, the Court also noted that "tolerance should be even greater in a case, such as this one, where the consequence of noncompliance with the enactment is not a civil penalty, but merely a reduction of a government subsidy." *Id.* The Court further held that in this context "facial vagueness occurs when a statute is expressed in terms of such generality that 'no standard of conduct is specified at all.' ... Such a provision simply has no core." *GMHC I*, 733 F.Supp. at 639 (quoting *Brache v. County of Westchester*, 658 F.2d 47, 50 (2d Cir. 1981), *cert. denied*, 455 U.S. 1005, 102 S.Ct. 1643, 71 L.Ed.2d 874 (1982); *Coates v. City of Cincinnati*, 402 U.S. 611, 614, 91 S.Ct. 1686, 1688, 29 L.Ed.2d 214 (1971); *Smith v. Goguen*, 415 U.S. 566, 578, 94 S.Ct. 1242, 1249–50, 39 L.Ed.2d 605 (1974)). Thus, plaintiffs will be entitled to summary judgment if they prove that the Revised Grant

Terms have no "core meaning" in any of their applications. *Id.* If, however, the Court finds that the grant terms have a core meaning that can reasonably be understood by a person of ordinary intelligence, then the provisions may validly be applied to conduct within the core meaning, and a finding of facial vagueness is precluded. *Brache*, 658 F.2d at 51. For the following reasons, the Court finds that plaintiffs have successfully established that the Revised Grant Terms have no core meaning, and are thus unconstitutionally vague.

A. Lack of Clarification or Guidance by the CDC

First, the CDC has failed to clarify the crucial terms set forth in the Revised Grant Terms or provide any meaningful guidance to the PRPs or AIDS educators regarding the application of the Revised Grant Terms. It is true that the CDC has eliminated the two terms, "educated adult" and "reasonable person," which the Court specifically referred to as potentially void for vagueness in *GMHC I*.[29] *GMHC I*, 733 F.Supp. at 639. It is also true that the CDC has somewhat clarified the disputed terms in the Revised Grant Terms.[30] For example, CDC has changed the wording of the terms from "a majority of *persons* outside the intended audience" to "a majority of *adults* outside the intended audience," in an effort to "further clarify that this standard is to be applied to persons age 18 and older." 55 Fed.Reg. at 23415. Further, by example, CDC has provided guidance as to what is not "offensive" within the meaning of the Revised Grant Terms. Specifically, the Revised Grant Terms indicate that certain materials, such as the *Surgeon General's Report on Acquired Immune Deficiency Syndrome* (October 1986), attached as Exhibit "J" to Declaration of Dr. Gary R. Noble, executed on May 29, 1991 ("Noble

---

**29.** Defendants' contention that *GMHC I* only identified two specific terms, "educated adult" and "reasonable person" as potentially void for vagueness, is incorrect. The opinion makes clear that the Court recognized that plaintiffs were challenging the "offensiveness" aspect of the CDC grant terms as void for vagueness. *See GMHC I*, 733 F.Supp. at 638. The Court's questioning of the two specific phrases was merely representative. Thus, even though defendants

have eliminated those two terms from the Revised Grant Terms, the Court must still analyze the Revised Grant Terms as potentially void for vagueness.

**30.** In *GMHC I*, the Court noted that CDC "ha[d] not set forth a clarification of the disputed terms." *GMHC I*, 733 F.Supp. at 639.

Dec. IV"), and other CDC-developed AIDS educational materials, meet the standards set forth in the Revised Grant Terms.

Nevertheless, the Court finds that the CDC has failed to substantially clarify the disputed terms or provide sufficient guidance to AIDS educators or panel members. Despite the attempted clarifications, the "offensiveness" standard remains essentially undefined. To date, the CDC has made no affirmative statement as to what constitutes "offensive" materials, nor has it set forth a method by which to determine what materials will be deemed "offensive" under the Revised Grant Terms.[31] As such, plaintiffs are correct when they assert that the Revised Grant Terms provide

no way of answering questions such as: Can educational material be offensive simply because it mentions homosexuality? Because it depicts an interracial couple? Can a proposed AIDS education project be offensive because it traps a captive audience, such as subway riders, and forces them to look at a condom? Does offensive apply to all descriptions of sexual behavior, graphic depictions of sexual behavior, or descriptions of unusual sexual behavior? Pl. Mem., at 34–35.[32]

The addition of a sole example fails to provide the necessary clarification of the "offensiveness" standard.[33] Defendants are correct that examples may be used to add definiteness to a standard and avoid a

**31.** This lack of clarification is especially problematic given the inherently subjective nature of the term "offensive." As plaintiffs point out, the term "offensive" is similar to words like "contemptuous," and "annoy," which have been declared unconstitutionally vague in other contexts because "what is contemptuous to one man may be a work of art to another," *Smith v. Goguen*, 415 U.S. 566, 573, 94 S.Ct. 1242, 1247, 39 L.Ed.2d 605 (1974) (holding flag contempt statute unconstitutionally vague), and "[c]onduct that annoys some people does not annoy others." *Coates v. Cincinnati*, 402 U.S. 611, 614, 91 S.Ct. 1686, 1688, 29 L.Ed.2d 214 (1971). The same subjectivity is involved in the present case as "a fundamentalist church group will find offensive that which a youth gang member will find everyday language," and "showing a penis model and doing a condom demonstration may be offensive to an elderly population, but would offer concrete training to a group of individuals with mental retardation." *See* Comments to CDC submitted in response to proposed rulemaking, attached as Exhibit "B" to Harlow Dec. I.

**32.** Defendants are correct that a finding of unconstitutional vagueness cannot be based on potential uncertainty at the margins. *United States v. National Dairy Corp.*, 372 U.S. 29, 32, 83 S.Ct. 594, 597, 9 L.Ed.2d 561 (1963). It is also true that statutes should not be declared unconstitutionally vague by speculating about possible hypothetical applications. *Planned Parenthood of Minnesota v. Minnesota*, 910 F.2d 479, 482 (8th Cir.1990). Plaintiffs' questions, however, are not about hypothetical cases, but rather relate to specific instances that have arisen under the Revised Grant Terms. For example, plaintiffs asked whether educational materials might fail the offensiveness test merely because they depicted an interracial couple. This is not a hypothetical question, as a poster of a black and white man sitting together, created by the National Association of Black and

White Men Together, has already encountered difficulty under the grant terms. *See* Williams Dec., at ¶¶ 7, 9 (determination by the Director of the AIDS Office for the County of Los Angeles that the poster would be perceived as offensive and denied approval). Further, plaintiffs asked whether a mere depiction of homosexuality could give rise to PRP disapproval. Again, this is not a hypothetical question as a PRP in North Carolina denied approval for a poster that showed two men together, holding condoms and draped in a flag. *See* Prybylo Dec., at ¶¶ 7–8; Exhibit "A" to Harlow Dec. II.

Defendants nevertheless contend that plaintiffs cite no examples of PRP decisions that have turned on these hypothetical fact patterns. They also assert that mere mention of homosexuality has never been considered offensive. *See* Surgeon General's Report, attached as Exhibit "J" to Noble Dec. IV, at 15 (discussing homosexual relations), *id.* at 17 (discussing the use of condoms ("rubbers")), *id.* at 17–18 (discussing oral and anal sex); *see also* Noble Dec. IV, at ¶ 17 (PRP approved materials referring to "oral sex," "pre-cum," "anal intercourse," "mutual masturbation," "rimming," and "fisting").

Ironically, rather than indicating that plaintiffs' questions deal with possible hypothetical applications, defendants' contentions illustrate the lack of an ascertainable standard. While the CDC maintains that the mere mention of homosexuality is not offensive, a PRP in North Carolina has denied approval of a poster that depicts two men together, holding condoms and draped in a U.S. flag.

**33.** In *Planned Parenthood of Central and Northern Arizona v. Arizona,* where the court upheld an appropriations bill against a vagueness challenge, the Arizona state attorney general had issued an opinion which defined and elaborated on the meaning of the contested phrase, "counseling for abortion procedures." *See GMHC I,* 733 F.Supp. at 638, 639.

vagueness determination. *See e.g., Murphy v. Matheson,* 742 F.2d 564, 572 (10th Cir.1984) (list of examples provided sufficient definiteness to statute); *United States v. Dyer,* 750 F.Supp. 1278, 1298 (E.D.Va.1990) (same). These cases, however, involved elaborate definitions, including numerous examples, of the prohibited conduct. The statute at issue in *Murphy* contained a long list of covered drug paraphernalia as well as a section devoted to what should be considered in determining whether an object is drug paraphernalia. Similarly, the statute in *Dyer* listed fifteen specific examples of drug paraphernalia.

By contrast, in this case a sole example is provided, and it is not particularly helpful. Although the *Surgeon General's Report on Acquired Immune Deficiency Syndrome* discusses such issues as homosexual relations, the use of condoms and oral and anal sex, it was written six years ago and discusses these issues in a clinical and sanitized manner. Moreover, whereas the Revised Grant Terms state that materials should not include "terms, descriptors, or displays which *will be* offensive ...," the Report is merely an example of what is *not* offensive. Further, since the CDC has not indicated where within the range of acceptability this example falls, very little guidance is actually provided to AIDS educators and panel members. Unless other materials produced are exactly like the example, one has no idea whether they will comply with the standard.

Compounding the confusion is CDC's failure to provide guidance as to how a PRP is to determine whether terms, descriptors, or displays "will be offensive to a majority of the intended audience [34] or to a majority of adults outside the intended audience." Substituting the word "adults" for "persons" provides some clarification, but it does not significantly aid a PRP in determining what is offensive to millions of people. Nor does it clarify how a PRP is to carry out its function. Is a PRP to conduct an exhaustive poll on each set of materials submitted to determine whether they are offensive to a majority of adults outside the intended group? Even if this type of poll would be feasible, who is to be the target of the poll? Further, how should a local government's or local organization's PRP determine the opinion of a majority of adults in its city, county, state or nation.[35]

This lack of guidance is especially troubling given that the Revised Grant Terms require PRP members to gauge the reac-

---

**34.** Defendants contend that because no commentators in the CDC's notice-and-comment procedure specifically objected to the phrase "offensive to a majority of the intended audience," the term "offensive" plainly has a core meaning at least in that sense. And, according to defendants, that core meaning is not affected by the addition of a limitation on materials that may be "offensive ... to a majority of persons outside the intended audience." *See* Def.Mem., at 28–29; Def.Rep.Mem., at 59–60. The Court disagrees.

First, some of the comments received by the CDC do in fact object to both uses of offensiveness. *See* Comments of State of New Hampshire; T.H.E. Clinic for Women; Austin ACT UP, attached as Exhibit "B" to Harlow Dec. I.

Second, as plaintiffs assert, it is reasonable that commentators would highlight their concerns with a standard based on "offensiveness" outside the intended audience, since that test is wholly disconnected from any concern with improving public health. *See* Pl.Mem., at 36 n. 16.

Third, since the "offensive" standard has not been clarified and remains undefined by the CDC, the Court finds that "offensive" is an unascertainable criterion in either context, regardless of the comments received by the CDC.

**35.** Although the Revised Grant Terms provide that "national/regional/State organization reviews should adopt a national/regional/statewide standard when applying ... Basic Principles 1.a and 1.b to the respective concepts of "intended audience" and "majority of adults outside the intended audience," they provide no guidance to local review panels as to which standards to adopt. 55 Fed.Reg. at 23417 (The CDC's earlier mention of community standards" has been removed from the revised grant terms. *Cf.* 53 Fed.Reg. 6035 (the "panel, guided by the CDC Basic Principles ... in conjunction with prevailing community standards will review and approve" all materials)).

Defendants maintain, however, that since the Revised Grant Terms provide that "[m]aterials reviewed by ... a national, regional, or state [PRP] do not need to be reviewed locally," it is implied that local PRPs must apply a local standard. The Court disagrees as no evidence has been presented that local PRPs should apply such a standard. Thus, the Court finds that a city or other local PRP does not know the group of adults outside the intended audience that it must consider.

tions of members of the public, *see Big Mama Rag, Inc. v. United States,* 631 F.2d 1030, 1037 (D.C.Cir.1980) (the regulation's vagueness is especially apparent in that portion of the test expressly based on an individualistic—and therefore necessarily varying and unascertainable—standard: the reactions of members of the public), as well as engage in two levels of subjective analysis, i.e., PRP members have to form their own subjective opinions about the subjective opinions of a majority of other adults. Specifically, PRP members have to make a subjective determination as to what a majority of other adults will think offensive.[36]

Finally, the addition of an "effectiveness" inquiry does not provide the Revised Grant Terms with a core meaning.[37] "Effectiveness" is similarly subjective and undefined, and the CDC proffers no guidance to PRPs as to how to assess "effectiveness." As such, there is no way to answer the following questions: Is effectiveness to be measured by how well a message is communicated? By the materials' impact on the rate of HIV infection? (If so, how is that rate to be determined?) Or is effectiveness measured by the ability of the education materials to help individuals change their behaviors? Over the short term or the long term? Or is effectiveness to be judged by the degree to which the materials encourage sexual abstinence?

Moreover, under the Revised Grant Terms, "effectiveness" only comes into play as a factor for the PRP to consider if the materials communicate "an important HIV prevention message." However, again, there is no guidance as to what constitutes such a message, and the PRPs as well as AIDS educators are left in the dark as to which HIV prevention messages are important and which are unimportant. Further, although the Revised Grant

Terms require a PRP to determine whether the potential "offensiveness" of educational materials is outweighed by the potential "effectiveness" of such materials, the CDC has offered no guidance as to how to balance these two subjective, undefined and seemingly incomparable terms against each other. As such, PRPs are forced to guess how "effective" materials must be to overcome a conclusion of "offensiveness."

Thus, despite defendants' attempted clarifications, the Court finds that no "core meaning" can be discerned from the Revised Grant Terms.

### B. Overlap With Constitutional Standards

Defendants contend that the core meaning of the "offensiveness" standard has been defined not only by example contained in the Revised Grant Terms themselves,[38] but by reference to the obscenity standard. According to the defendants, since the "offensiveness" standard clearly encompasses legally "obscene" materials, the Revised Grant Terms contain a core meaning. The Court disagrees.

As the plaintiffs assert, a restriction that prohibited the funding of all "rude," "unpopular," "erotic," "annoying," "controversial," or "upsetting" materials would also likely encompass legally obscene materials. However, the fact that a broad, undefined, and vague term overlaps with a more specific, well-defined and constitutional prohibition, does not make the broader language constitutional. Because the obscenity standard is inherently narrower than the offensiveness criterion, there is a vast amount of material that could be developed that would be deemed offensive, but not obscene. As such, the Court finds that reference to the obscenity standard offers no real guidance or clarification to either AIDS educators or PRP members.[39]

---

**36.** As stated above, *see supra* note 31, such subjectivity plays a part in the vagueness analysis.

**37.** The defendants claim that the "effectiveness" mechanism "specifically responds to concerns that the term 'offensive' may be considered vague." *See* Def.Mem., at 29.

**38.** As discussed above, the Court found that a core meaning could not be defined by the example contained in the grant terms. *See supra,* 39–40.

**39.** In addition, the evidence of how the original and revised grant terms have been applied does not correspond in any way to obscenity. Sever-

Moreover, the Court will not permit the defendants to rely on the judicially defined obscenity standard to provide the grant terms with core meaning, when they have chosen instead to impose a nebulous and undefined "offensiveness" standard. If defendants seek to rely on the constitutional obscenity standard, they should adopt it, as the plaintiffs have urged.[40] Such adoption would be consistent with the National Endowment for the Art's (NEA) decision to tailor its restrictions to the legal standard for obscenity. Under the terms of a recent settlement, the NEA will demand return of its funds from a grantee only if the grantee is convicted in a judicial proceeding of violating a criminal obscenity or child pornography statute. *See New School for Social Research v. Frohmayer*, No. 90 Civ. 3510 (LLS) (S.D.N.Y. Feb. 19, 1991) (settled by stipulation).[41]

### C. Implementation of the Revised Grant Terms

Defendants also argue that the a core meaning has been defined by implementation of the grant terms over the course of more than five years. This argument is unpersuasive as the defendants have never explained the content of the standard that has allegedly emerged from the implementation of the grant terms. Nor have the defendants collected or published the PRP decisions so that a concrete record would exist as to what constitutes "offensive" materials.

al of the items rejected by PRPs have not been sexually explicit at all. For example, the poster prepared by Metrolina AIDS Project and rejected in August 1990, simply show two men draped in a flag and holding condoms under the caption "Life, Liberty & the Pursuit of Happiness." Prybylo Dec., at ¶ 7; Exhibit "A" to Harlow Dec. II. Similarly, the National Task Force on AIDS Prevention of the National Association of Black and White Men Together has encountered difficulty under the grant terms with posters that are not sexually explicit. Williams Dec., at ¶¶ 3–10.

**40.** Plaintiffs have represented throughout this proceeding that the adoption of an obscenity standard would provide a constitutionally permissible mechanism for resolving the instant case. Pl. Mem., at 3–4.

### D. Applicable Caselaw

Defendants contend that plaintiffs have failed to cite any case in which a court has determined that the term "offensive" is *per se* unconstitutionally vague. Defendants also contend that there are a "host" of cases in which the term "offensive" has survived vagueness challenge, and according to defendants, these cases establish beyond peradventure that the term contains at least a core meaning. Def. Rep. Mem., at 64–65, n. 78, n. 79. The Court finds, however, that the applicable case law supports the opposite conclusion, namely, that the term "offensive" has no core meaning in the present context.

#### 1. Use of the term "offensive"

The defendants rely on three cases in support of their proposition that the term "offensive" is capable of constitutional application, i.e., that the term has a core meaning: *Chaplinsky v. New Hampshire*, 315 U.S. 568, 62 S.Ct. 766, 86 L.Ed. 1031 (1942), *Bethel School District No. 403 v. Fraser*, 478 U.S. 675, 106 S.Ct. 3159, 92 L.Ed.2d 549 (1986), and *FCC v. Pacifica Foundation*, 438 U.S. 726, 98 S.Ct. 3026, 57 L.Ed.2d 1073 (1978). Defendants reliance on these cases, however, is misplaced.

In *Chaplinsky*, the appellant challenged, on vagueness grounds, a New Hampshire law which provided that "[n]o person shall address any offensive, derisive or annoying word to any other person who is lawfully in any street or other public place, nor call

**41.** The defendants also argue that the Revised Grant Terms which appear in the March 30, 1992 Federal Register, make clear that any material that would have failed to meet the Kennedy–Cranston standard would also fail the "offensiveness" standard contained in the grant terms. *See* Government's letter to the Court, dated April 10, 1992, at 2. Thus, defendants contend that at least in this regard, the grant terms plainly have a core meaning. *Id.* Again, the Court disagrees as there is a multitude of educational materials that could be developed that would pass muster under the Kennedy–Cranston standard, but nevertheless be deemed "offensive" by designated PRPs.

him by any offensive or derisive name ..." *Id.* at 569. The Supreme Court upheld the statute against First Amendment challenges as it had been narrowly construed by the New Hampshire state court to prohibit only "fighting words," i.e., those words which "have a direct tendency to cause acts of violence by the persons to whom, individually, the remark is addressed." *Id.* at 573. As such, the Supreme Court noted that "[a]ppellant need not ... have been a prophet to understand what the statute condemned." *Id.* at 574 n. 8.

On the strength of *Chaplinsky*, defendants argue that one core meaning of "offensive," namely "fighting words," is not unconstitutionally vague. Even if defendants are correct and *Chaplinsky* did establish that "offensive" has at least one constitutionally permissible core meaning, that is not the end of the analysis as it is not enough simply to establish that the term "offensive" has a core meaning in a wholly irrelevant context. Defendants have failed to explain what possible benefit the "fighting words" definition has in the case at bar. It is impossible to imagine how fighting words, which are limited to face-to-face direct personal insults, would ever come before a PRP for review. Thus, the core meaning established in *Chaplinsky* offers no guidance to PRP members or AIDS educators.

Moreover, defendants fail to recognize that in the present case, unlike in *Chaplinsky*, there is no relevant judicial interpretation of the CDC's grant terms. Nor has the CDC itself provided any specification or clarification of the term "offensive."

Similarly, *Bethel* and *Pacifica* fail to support the existence of a core meaning in this case. In *Bethel*, the Supreme Court held that the First Amendment did not prevent the School District from disciplining respondent for giving an "offensively lewd and indecent speech" at an assembly. *Id.* at 676. In *Pacifica*, the Court upheld a prohibition of a broadcast containing words conceded to be "vulgar," "offensive," and "shocking."

In these cases, however, there was no vagueness challenge to the term "offensive." Rather, the basic dispute in both cases was about whether plainly "offensive," *see Bethel*, 478 U.S. at 683, 106 S.Ct. at 3164, and undisputedly "offensive," *see Pacifica*, 438 U.S. at 747, 98 S.Ct. at 3039, language could be prohibited in certain well-defined situations. Thus, the Supreme Court neither focused on whether the term "offensive" had a core meaning, nor determined that the term was capable of constitutional application in a regulatory context. Moreover, in each of the above decisions the Court emphasized the narrow, particularized enforcement context. In *Bethel*, the Court acknowledged that it was dealing with a situation "where the speech is sexually explicit and the audience may include children." *Id.* at 684, 106 S.Ct. at 3165. In *Pacifica*, similarly, the Court made clear that it was concerned with "indecent" programming during hours when children were more likely to be in the audience. *Id.* at 748–50, 98 S.Ct. at 3040–41.[42]

These cases are in sharp contrast to the instant case where the CDC has not limited its offense standard to sexually explicit depictions, or to situations involving exposure to children.

### 2. Communications cases

Defendants also seek support for the Revised Grant Terms in the FCC's "indecency" standard which was upheld in *Dial Information Services Corp. of New York v. Thornburgh*, 938 F.2d 1535 (2d Cir.1991), *Action for Children's Television v. FCC*, 932 F.2d 1504 (D.C.Cir.1991), and *Information Providers' Coalition v. FCC*, 928 F.2d 866 (9th Cir.1991). In upholding the constitutionality of the term "indecent," however, these cases only serve to demonstrate the lack of core meaning of the "offensiveness" standard.

In *Dial Information Services*, the Court of Appeals for the Second Circuit reversed a district court ruling in *American Infor-*

---

**42.** Further, as will be discussed in detail below in the Communications cases section, in *FCC v. Pacifica* much of the Court's discussion focused on the term "indecent," which, unlike the term "offensive" in this case, has been defined by the FCC.

*mation Enterprises, Inc. v. Thornburgh,* 742 F.Supp. 1255 (S.D.N.Y.1990). In *American Information Enterprises,* the district court had issued a preliminary injunction enjoining enforcement of a statute that prohibits providers of "indecent" telephone communications for commercial purposes from making their services available to persons under 18 years of age.[43] The district court held, as a matter of law, that the term "indecent" in the statute was void for vagueness. Although the government argued that *Pacifica* set forth a precise definition of "indecent"[44] which should be incorporated into the Helms Amendment to provide the necessary specificity, the district court found that because *Pacifica* implicated the broadcast medium, rather than the telephone medium, "it cannot be assumed that the *Pacifica* definition of 'indecent' applies here." *American Information Enterprises,* 742 F.Supp. at 1271. According to the district court, the FCC had simply reiterated the *Pacifica* definition, *see In re Regulations Concerning Indecent Communications by Telephone,* Gen. Dkt. No. 90–64, ¶ 12 (Report and Order, released June 29, 1990) ("Report and Order"), and was therefore merely "assuming" that the *Pacifica* definition would be "what courts will find 'indecent' to mean in [the] Helms Amendment." *Id.* at 1269. As such, the court would not apply the *Pacifica* definition to the telephone context. With the *Pacifica* definition not applicable, the district court determined that:

> Without any additional specificity, the term "indecency" on its own is too vague to pass constitutional muster. The term indecency does not inherently contain within it a reference to specifically defined conduct, as does the term "obscenity." ... Moreover, the term does not appear in the context of a specific definition of conduct ... The statute and regu-

lations only make a person of common intelligence aware that "offensive" communications are to be restricted. There must be notice of what constitutes such indecency or offensiveness, or else: there is not fair notice of what is restricted; the statute can be arbitrarily enforced; and protected expression could be deterred.

*American Information Enterprises,* 742 F.Supp. at 1271.

The Second Circuit reversed, however, holding that "indecent," as used in the Helms Amendment, has been defined clearly by the Federal Communication Commission ("FCC") pursuant to its statutory direction to prescribe by regulation procedures for preventing access to dial-a-porn by minors. *Dial Information Services,* 938 F.2d at 1541. In fact, the June 29, 1990 Report and Order released by the FCC specifically provided that:

> [I]n the dial-a-porn context, we believe it is appropriate to define indecency as the description or depiction of sexual or excretory activities or organs in a patently offensive manner as measured by contemporary community standards for the telephone medium.

Report and Order, ¶ 12. According to the Second Circuit, the District Court did not accord proper weight to the foregoing interpretation, made by the agency charged with the administration of the statute. *Dial Information Services,* 938 F.2d at 1541 (citing *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 842–45, 104 S.Ct. 2778, 2781–83, 81 L.Ed.2d 694 (1984)).

The Second Circuit further noted that the Commission's recent dial-a-porn definition of "indecent" tracks the definition that the FCC developed in the radio broadcast con-

---

**43.** The statute in question is the 1989 amendment ("the Helms Amendment") to the Communications Act of 1934, 47 U.S.C. §§ 223(b) and (c).

**44.** The definition set forth by the FCC in *Pacifica* was as follows:

[T]he concept of "indecent" is intimately connected with the exposure of children to lan-

guage that describes, in terms patently offensive as measured by contemporary community standards for the broadcast medium, sexual or excretory activities and organs, at times of the day when there is a reasonable risk that children may be in the audience.

*Id.* at 731–32.

text, and that passed muster in *Pacifica*.[45] *Dial Information Services*, 938 F.2d at 1541. The Court of Appeals determined, however, that the FCC's tracking of the earlier *Pacifica* definition in its July 29, 1990 Report and Order, does not mean that the FCC was merely "assuming" that the *Pacifica* definition would be "what courts will find 'indecent' to mean in [the] Helms Amendment." *Id.* (quoting *American Information Enterprises*, 742 F.Supp at 1269). In fact, the court determined that it was clear that the FCC was not predicting what courts would do. "Rather, [in the Report and Order] it was defining a term contained in a statute it was required by Congress to administer. This is no less so because it was following an earlier FCC definition embraced in a court decision relating to the broadcast medium." *Dial Information Services*, 938 F.2d at 1541.

·Thus, the Second Circuit concluded that the term "indecent" as used in the Helms Amendment was sufficiently defined to provide guidance to "the person of ordinary intelligence" in the conduct of his affairs, *id.* (quoting *Grayned v. City of Rockford*, 408 U.S. 104, 108, 92 S.Ct. 2294, 2298, 33 L.Ed.2d 222 (1972), and rejected appellees' vagueness challenge.[46]

An analysis of the *Dial Information Services* opinion leads inevitably to the conclusion that the CDC's Revised Grant Terms are without a core meaning, and thus unconstitutionally vague. First, as can be seen from a comparison of the district court and Court of Appeals opinions,

the Second Circuit reversed based upon the district court's failure to conclude that the term "indecent, as used in the Helms Amendment, had been 'defined clearly by the Federal Communications Commission.'" *Dial Information Services*, 938 F.2d at 1540. Therefore, the reversal as to the vagueness issue was based upon erroneous fact-finding by the district court. As such the district court's analysis of the legal issue of unconstitutional vagueness[47] remains viable and instructive for reviewing subjective terms such as "indecent" or "offensive" that are not defined by the agency that invokes them.

Second, the *Dial Information Services* opinion highlights the difference between a clearly defined term and an undefined subjective standard, such as the "offensiveness" criterion in the CDC's Revised Grant Terms. As the opinion and related case law indicate, the FCC's definition of "indecent" was specifically set forth in a FCC Report and Order and drawn from decades of that agency's interpretation of "indecent" communications.[48] Moreover, the FCC definition is specifically limited to "depiction[s] of sexual or excretory activities or organs." *Dial Information Services*, 938 F.2d at 1540. Thus, a court may properly conclude that the FCC's regulatory scheme for dial-a-porn telephone services passes constitutional muster. *See Dial Information Services*, 938 F.2d at 1541; *Information Providers' Coalition v. FCC*, 928 F.2d at 874. By contrast, the CDC's Revised Grant Terms do not limit potential

---

**45.** *See supra* n. 44.

**46.** *See also Action for Children's Television v. FCC*, 932 F.2d 1504, 1508 (D.C.Cir.1991) (rejecting vagueness challenge to term "indecent"); *Information Providers' Coalition v. FCC*, 928 F.2d 866, 874 (9th Cir.1991) (The term "indecent" in the Helms Amendment is not vague in the dial-a-porn context because the Commission defined "indecent" in the Report and Order as "the description or depiction of sexual or excretory activities or organs in a patently offensive manner as measured by contemporary standards for the telephone medium.")

**47.** *See American Information Enterprises*, 742 F.Supp. at 1271 ("the term 'indecency' on its own is too vague to pass constitutional muster. The term indecency does not inherently contain within it a reference to specifically defined con-

duct ... Moreover, the term does not appear in the context of a specific definition of conduct ...").

**48.** The definition of "indecent" in the broadcast setting, upon which the dial-a-porn definition is based, has since 1927 been explicated by the FCC and gained meaning in the broadcast context. *See Action For Children's Television v. FCC*, 932 F.2d at 1506–1507. The implementation of the CDC grant terms, by contrast, has not developed any body of information that can guide PRP members and AIDS educators as to the grant terms' meaning. Public prosecutions and rulings are not involved, as they are with the FCC, nor are PRP decisions in any routine way made public.

offense to explicit depictions of bodily functions or organs, and they contain subjective terms that have never been defined or explained. Accordingly, the Court finds that they are unconstitutionally vague. *See Dial Information Services*, 938 F.2d at 1541 (quoting *Grayned*, 408 U.S. at 108, 92 S.Ct. at 2298) (administrative terms must be "sufficiently defined to provide guidance to the 'person of ordinary intelligence' ").[49] As the district court instructed in *American Information Enterprises*, it is simply not enough for the CDC to invoke the word "offensive," without any effective clarification.

### 3. "Offensive" as part of a constitutional standard

The defendants have also argued that the term "offensive" clearly has a core meaning because it has been approved as part of the Supreme Court's "obscenity" standard, *see Miller v. California*, 413 U.S. 15, 24, 93 S.Ct. 2607, 2615, 37 L.Ed.2d 419 (1973) (the basic guidelines for the trier of fact must be "whether the work depicts or describes, in a patently offensive way, sexual conduct specifically defined by the applicable state law"), and as part of the FCC's "indecency" standard in the telephone context. *See Dial Information Services*, 938 F.2d at 1540 (quoting Report and Order) ("description or depiction of sexual or excretory activities or organs in a patently offensive manner"). The Court disagrees.

Simply because "offensive" appears in the "obscenity" and "indecent" standards does not mean that "offensive" standing alone is a sufficient constitutional standard. *Miller* and *Dial Information Services* hold only that the two standards as a whole are constitutionally permissible. *Miller*, 413 U.S. at 24–25, 93 S.Ct. at 2615; *Dial Information Services*, 938 F.2d at 1541.

Moreover, in contrast to the CDC grant terms in the instant case, neither the "indecency" nor "obscenity" standard necessitates that the term "offensive" be applied in a vacuum. Rather, in both cases, the term "offensive" is limited to very particular depictions and descriptions.[50] Whereas in the present case the grant terms allow the PRPs to consider any type of offense, in *Miller*, "offense" is to be determined with reference to depictions or descriptions of "hard core sexual conduct," *id.* at 27, 93 S.Ct. at 2616, "representations or descriptions of ultimate sexual acts, normal or perverted, actual or simulated," *id.* at 25, 93 S.Ct. at 2615, and "representations or descriptions of masturbation, excretory functions, and lewd exhibition of the genitals." *Id.* Similarly, in *Dial Information Services*, "offense" is to be determined with reference to "description[s] or depiction[s] of sexual or excretory activities or organs." *Id.* 938 F.2d at 1540.

Thus, despite the fact that two constitutional standards make reference to the term "offensive," the Court finds the term, as used in the CDC's Revised Grant Terms, to be unconstitutionally vague.

### E. Application of the Revised Grant Terms

Before the Court discusses how the Revised Grant Terms have been applied, it is necessary to first establish the relevance of such application. Since plaintiffs have alleged that the Revised Grant Terms are on their face unconstitutionally vague, evidence of how the regulatory scheme has been implemented is relevant, but not necessary to establish plaintiffs' vagueness claim. Thus, the main focus of the vagueness analysis remains the above discussion of the grant terms themselves.

**49.** It is true that the CDC grant terms at issue in this case must be reviewed on a more relaxed vagueness standard than in *Dial Information Services* and *American Information Enterprises* because no criminal penalties are involved, and the government's decision not to subsidize offensive speech does not infringe any fundamental right. *See GMHC I*, 733 F.Supp. at 636. However, the Court finds that even under the most relaxed standard, the Revised Grant Terms are unconstitutionally vague as there has been no meaningful definition or clarification by the CDC of the "offensiveness" criterion.

**50.** *See also supra* 48, 53 for discussion on the limitations of the "offensive" standard in the communications context.

In this case, however, it is helpful to look at how the Original [51] and Revised Grant Terms have been applied, as specific instances of implementation illustrate that the grant terms have no discernible core meaning and are standardless in practice. First, the results of various PRP decisions indicate the arbitrariness of the Revised Grant Terms. In one instance, the National Association of Black and White Men Together ("BWMT") received a $1 million, five-year grant from the CDC to educate minority men who have sex with men. Williams Dec., at ¶ 1. As part of its application, the organization included information about and a sample advertising poster for "Hot, Horny, and Healthy Playshops." *Id.* at ¶ 3. The CDC approved the application without comment. *Id.* at ¶ 4. The San Francisco PRP also approved the advertising poster as well as a second poster that depicted a white man and black man sitting on the floor together. In the District of Columbia and in Los Angeles, however, local affiliates of BWMT suffered disapprovals of proposals to hold such workshops with locally-distributed CDC money because the workshops were perceived as offensive and contrary to the grant terms. *Id.* at ¶¶ 8–10. They also suffered disapprovals of the two advertising posters.[52]

Defendants contend, however, that at least two PRP decisions clearly establish the core meaning of the grant terms. One decision involved a 1989 PRP disapproval of "safe sex comics," which graphically depicted masturbation, anal intercourse, fellatio, and urination. *See* Def.Rep.Mem., at 58; Exhibit "B" to Noble Dec. IV (copies of comics). In this case, some PRP members determined that the materials were "offensive to most adults, including gay and bisexual men." Exhibit "A" to Noble Dec. IV, at 2 (PRP Report). The second decision involved an instance where a PRP approved a condom brochure that featured photographs of erect penises with the limitation that the brochures be marked "sexually explicit." Exhibit "C" to Noble Dec. IV; Noble Dec. IV, at ¶ 10.

However, if these examples establish the core meaning of the grant terms, then it is impossible to explain why in August 1990 a local PRP rejected one proposal which depicted two men draped in a flag and holding condoms, and another which was a safer-sex brochure that described a variety of sexual behaviors engaged in by gay/bisexual men and the risks associated with each. *See* Prybylo Dec., at ¶¶ 7–8. It is also difficult to explain why a PRP required the Metrolina AIDS Project to remove the words "fun," "exciting," and "sexy" from a brochure, as well as all references to gay men, leaving any reference to sexual orientation out of the pamphlet. *Id.* at ¶ 10.[53]

The Court finds that the only adequate explanation is that the grant terms are too vague to apply in a non-arbitrary manner.

Second, documents regarding the panels' deliberations as to the Original Grant Terms provide additional evidence of the unpredictable application of the grant terms. A review of the documents indicates that PRP members were unable to recognize any core meaning in the "offensiveness" criterion. For example, all of the following were given by PRP members as

---

**51.** Decisions of PRPs under the Original Grant Terms are relevant because the "offensiveness" criterion, on which most PRP rejections are based, has remained the same since its inception in 1986, with almost no additional clarification under the Revised Grant Terms.

**52.** Although the decisions in Los Angeles and Washington, D.C. appear to have been made by officials of localities or states that distribute CDC money for education, rather than by PRPs, the decisions were nonetheless based upon the grant terms and demonstrate the terms' vagueness.

**53.** In their reply brief, defendants argue that because PRPs have approved a host of materials over the years, plaintiffs cannot establish that the grant terms have never been validly applied. Def.Rep.Mem., at 58–59. The Court determines, however, that simply because PRPs have reached favorable decisions as to certain materials does not establish that the Revised Grant Terms contain a core meaning capable of valid application. Moreover, examples of PRP approval do not destroy plaintiffs' vagueness challenge because as stated above, it is not necessary for the Court to delve into examples of implementation in order to make a finding that a standard is vague on its face.

reasons for disapproving materials as "offensive":

(a) "I don't think cartoon figures are necessary to get the facts of AIDS across."

(b) "The patriotic connection with protection in the case of AIDS demeans Uncle Sam and all of us."

(c) "Tacky use of a respected symbol [Uncle Sam]"

(d) "Poor Taste"

(e) "Information on detailed safe sex practices should not be included in a general informational brochure on AIDS."

(f) "I have major concerns about using the image of a noted, deceased public figure, especially a Black leader [Dr. Martin Luther King]. While a poster for alcohol and drug abuse may be acceptable, there are certain implications regarding AIDS. Declaration of David Cole, executed on March 16, 1989 ("Cole Dec."), at ¶ 7 (filed with plaintiffs' first motion for summary judgment) and Exhibits "A"–"J", attached to Cole Dec.

Since there has been no effective clarification of the "offensiveness" criterion, *see supra* 37–43, there is no reason to believe that the Revised Grant Terms are being applied in a less arbitrary fashion. In fact, those that have attended PRP meetings under the Revised Grant Terms "cannot say for sure the precise test that [the panel] is applying." Prybylo Dec., at ¶ 5; *see also* Felshman Dec., at ¶ 6 ("When I have attended PRP meetings, it has been clear that the members did not know what the CDC's Basic Principles meant.")

F. The Grant Terms' Deterrent Effect

Evidence of self-censorship by AIDS education groups also provides evidence of the vagueness of the Revised Grant Terms. Because the grant terms are subjective and imprecise, AIDS educators cannot predict with any certainty what materials will be approved. Thus, they are forced to censor themselves and concentrate on proposals that will pass the "offensiveness" test with room to spare.

As plaintiffs point out, developing new educational tools, or even obtaining material and planning how to use it, requires a significant allocation of staff time and money. *See* Trowbridge Dec., at ¶ 12; Rampolla Dec., at ¶ 4. Moreover, the process of planning and PRP review takes valuable time before any education and prevention can occur. *See* Trowbridge Dec., at ¶ 9; Emanuel Dec., at ¶¶ 6–7; DeGroff Dec., at ¶ 6. Therefore, organizations dependent upon CDC funding cannot afford to waste resources and time using a trial-and-error approach to PRP review; they must self-censor to guarantee approval. As one CDC grant recipient explained:

AIDS educators, such as the Reimer Foundation, must pay attention at the planning and development stages to what the grant terms might mean and what kinds of materials might be rejected under them. We cannot afford to get hung up at the last minute by disapproval or revisions mandated by the PRP. We thus must engage in self-censorship.

Felshman Dec., at ¶ 8.

As evidence of this chilling effect, plaintiff Horizons, as well as the American Red Cross, the Reimer Foundation, and the Tucson AIDS Project, have provided the Court with specific examples of projects that have been abandoned or toned down because of anticipated problems with PRP approval. *See* Trowbridge Dec., at ¶ 8 ("The offensiveness criterion ... and the unpredictability of how that criterion would be administered led me to drop a plan to develop explicit, attention-grabbing brochures for a gay male audience"); *id.* at ¶ 9 ("We determined that to avoid PRP rejection we would have to use ... "semen," "feces," and "urine" [instead of "cum," "shit," and "piss"]); Comment letter from the American Red Cross, included in Exhibit B to Harlow Dec. I ("In developing brochures jointly with the CDC intended for adult women and men, we had to remove the colloquialism 'cum.'"); Felshman Dec., at ¶¶ 12, 14 (The Reimer Foundation, using private resources, produced and circulated explicit, clear palm cards that discussed safer sex for distribution in gay bars. The language on the cards was toned down before submitting them to the PRP); DeGroff Dec., at ¶ 9 (had to make compro-

mises in creating the campaign so as to have a good chance of approval).[54]

Moreover, all of the declarations from AIDS educators submitted in support of plaintiffs' motion describe the need to speculate ahead of time about what might happen under the indiscernible standard of the grant terms. *See* Prybylo Dec., at ¶ 11; DeGroff Dec., at ¶ 4, 6; Emanuel Dec., at ¶¶ 8–9; Trowbridge Dec., at ¶¶ 6, 10, 13; Williams Dec., at ¶ 13; Felshman Dec., at ¶¶ 8–10; Kunreuther Dec., at ¶ 3; Watson Dec., at ¶ 12; Rampolla Dec., at ¶¶ 3–4, 6–8.

Further, for some organizations the deterrent effect of the grant terms is so strong, they avoid seeking CDC funding. Plaintiff Hetrick Martin Institute, for example, focuses its services on the gay and lesbian youth population. To reach this population, the Institute has determined that comic books, other materials that use vernacular language, and a gay-positive approach are essential. Kunreuther Dec., at ¶¶ 4–5. Under the Revised Grant Terms, however, Hetrick Martin believes that "we probably would be unable to secure approval of our educational materials by a Program Review Panel. Thus, it does not make practical sense for us to apply for CDC funding, although we could put additional funding for HIV prevention to good use in serving lesbian and gay youth." *Id.* at ¶ 3.

For the aforementioned reasons, the Court finds that the Revised Grant Terms

have no core meaning that can reasonably be understood by a person of ordinary intelligence. As such, the Court finds that the grant terms are unconstitutionally vague. Accordingly, plaintiffs' motion for summary judgment on the issue of vagueness is granted, and defendants' motion is denied.[55]

## CONCLUSION

For the aforementioned reasons, plaintiffs' application for summary judgment on the question of whether the CDC exceeded its statutory authority in promulgating the Revised Grant Terms is granted, and defendants' motions are denied. The Court also grants plaintiffs' application for summary judgment on the issue of vagueness, and denies defendants motion on that issue. As a result of these two holdings, the Court need not rule on whether the Revised Grant Terms are rationally related to a legitimate governmental objective or have been applied in an arbitrary fashion. This opinion closes the case.

SO ORDERED.

---

**54.** Defendants contend that although plaintiffs claim that they have been deterred from producing materials that might violate the Revised Grant Terms, they have failed to produce copies of any such materials. *See* Bennett Dec. II, at ¶¶ 7, 13, 17, 20–22, 27, 28–29, 30, 37; *see also* Bennett Supp. Dec., at ¶¶ 7–42. According to defendants, plaintiffs argument of self-censorship is based solely on conclusory affidavits, which do not establish that the grant terms are vague. Def. Rep. Mem., at 72.

The Court disagrees. First, defendants are incorrect when they claim that plaintiffs have failed to produce copies of such materials. For example, Bennett's Supplemental Declaration indicates that the plaintiffs have produced copies of the palm cards that the Reimer Foundation proposed to distribute in gay bars; copies of an original version of a condom insert which used the words "cum," "shit," and "piss," and copies of a revised version without those words.

Second, defendants fail to realize the import of sworn declarations submitted by the plaintiffs that specifically discuss how they have been deterred from developing certain materials. Since there is no requirement that every sworn statement made in a declaration be supported with documentation and since defendants have not rebutted the information in these declarations, the Court may rely on them to establish elements of plaintiffs' claim.

Third, defendants have ignored plaintiffs convincing argument that no documentation exists for projects that were never developed.

**55.** Because the Court has determined, as a matter of law, that the CDC exceeded its statutory authority in implementing the Revised Grant Terms, and that the grant terms are unconstitutionally vague, it need not address whether the grant terms are rationally related to legitimate government objectives or have been applied in an arbitrary fashion.